629 A.2d 996

**Ronald WISKOSKI**

v.

**Karen WISKOSKI, Appellant.**

Superior Court of Pennsylvania.

Argued May 11, 1993.

Filed Aug. 9, 1993.

Paul J. Levy, Palmerton, for appellant.

Joseph C. Zola, Wilkes–Barre, for appellee.

Before BECK, POPOVICH and HESTER, JJ.

HESTER, Judge:

Karen Wiskoski, Mother, appeals from the order of the Carbon County Court of Common Pleas granting appellee-

Father, Ronald Wiskoski, primary physical custody of the parties' son, Zachary, beginning August 1, 1993. For the reasons which follow, we reverse.

Mother and Father married on March 20, 1988. One child, Zachary, was born of the marriage on October 16, 1988. This was Father's first marriage. Mother had been married before, and her two children from that marriage, Bob and Sean, resided with the parties and Zachary. At the time of the custody hearing, Bob was eleven, Sean was eight, and Zachary was nearly four. On February 7, 1992, the parties separated when Mother left the marital residence with the children and returned to Rhode Island where the family had lived from the time of the marriage until July, 1990.

The order appealed from provides that the parties share legal custody of Zachary. It further provides that from October 15, 1992, until July 31, 1993, primary physical custody of Zachary alternate between the parties for three to six month intervals. Beginning August 1, 1993, the order provides as follows:

3. Beginning August 1, 1993 and until otherwise modified, primary physical custody of Zachary shall be divided as follows:

a. Ronald Wiskoski shall have primary physical custody of Zachary during the school year with the exception of Christmas vacation, at which time Karen Wiskoski shall have the right to primary physical custody for the period of December 26 through January 1.

b. Karen Wiskoski shall have primary physical custody of Zachary during the non-school summer months. In calculating this time. (sic) Mother's custody shall begin two (2) days after school closes and terminate two (2) days before school reopens.

Based upon our consideration of the arguments of the parties, the opinion of the trial court, and our review of the notes of testimony, we conclude that appellant's arguments have merit.

It is clear that in matters of custody and visitation, the ultimate consideration of the court is a determination of

what is in the best interests of the child. Such a determination, made on a case-by-case basis, must be premised upon consideration of "all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *Lee v. Fontine,* 406 Pa.Super. 487, 488, 594 A.2d 724, 725 (1991), citing *Zummo v. Zummo,* 394 Pa.Super. 30, 574 A.2d 1130 (1990). In *Stolarick v. Novak,* 401 Pa.Super. 171, 584 A.2d 1034 (1991), we reiterated our scope of review as defined in *Mumma v. Mumma,* 380 Pa.Super. 18, 21, 550 A.2d 1341, 1343 (1988), as follows:

> In reviewing a custody order, we are not bound by findings of fact made by the trial court which are unsupported in the record, nor are we bound by the court's inferences drawn from the facts. *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 294–95, 368 A.2d 635, 637 (1977). However, on issues of credibility and weight of the evidence, we defer to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. *Id.* at 295, 368 A.2d at 637. Only where we find that the custody order is "manifestly unreasonable as shown by the evidence of record ..." will an appellate court interfere with the trial court's determination.

*See also Karis v. Karis,* 518 Pa. 601, 544 A.2d 1328 (1988); *Andrews v. Andrews,* 411 Pa.Super. 286, 601 A.2d 352 (1991).

Mother asserts that the trial court abused its discretion in awarding primary physical custody of Zachary to Father during the school year. In support, she contends the trial court failed to acknowledge her role as the primary caretaker, failed to consider the abuse to which Father had subjected her and the children, and failed to consider that its order results in the separation of siblings. In addition, she claims the court's factual findings and inferences therefrom are not supported by the record. We agree.

Absent compelling reasons to the contrary, it is the policy of this Commonwealth that siblings should be raised together whenever possible. *Pilon v. Pilon,* 342 Pa.Super. 52, 492 A.2d 59 (1985). "This factor is not diluted by the fact that

the children involved are half brothers and sisters." *In re Davis*, 502 Pa. 110, 124, 465 A.2d 614, 621 (1983). While this factor cannot be elevated automatically above all other factors, *it must be weighed in conjunction with the others. Id.* (Emphasis added.) "Good reasons" are not necessarily "compelling" reasons for disrupting the integrity of a family unit. *Pilon v. Pilon, supra.* "In defining the phrase 'compelling reasons' this court has said that the evidence must indicate that it was 'necessary' to separate the children, and the evidence was 'forceful' in this regard." *Cyran v. Cyran*, 389 Pa.Super. 128, 132, 566 A.2d 878, 880 (1989), citing *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157 (1980). Absent compelling reasons, "the children should be raised together in one household, for this permits the continuity and stability necessary for a young child's development." *Pilon v. Pilon, supra*, 342 Pa.Super. at 56, 492 A.2d at 60.

■ The testimony from all of the parties establishes that Zachary, Sean, and Bob were raised as brothers. *E.g.*, N.T., 6/22/92, vol. 2, at 70.[1] Due to the age disparity, there were some activities, such as sports, in which the older boys participated that Zachary did not, but he accompanied them on all of the outings that his age permitted. From the time Zachary was born, he has grown amidst two big brothers, and except for the period from November 1, 1992, through January 31, 1993, when the court ordered that Zachary reside with Father, the boys have been together. Obviously, to allow Father time with Zachary, the boys will be separated over the summer and during some holidays. However, Father has offered no compelling reasons, indeed, no reasons at all, to separate the children, and the trial court failed to consider this doctrine of "family unity" or "whole family doctrine." This was error.

■ Second, in light of our scope of review, we find that there are a myriad of factual findings and inferences drawn therefrom which are unsupported in the record. First, the

1. There are two volumes of testimony dated June 22, 1992. One volume indicates that it represents the morning session that day, and the other represents the afternoon session. Hereafter, the morning session will be referred to as vol. 1, and the afternoon session as vol. 2.

trial court concluded that Father was responsible for all of the children's evening meals, homework supervision, discipline, and personal hygiene. This finding, and its inference that Father was the primary caretaker, are not supported by the evidence. While it is true that Father made such a sweeping claim, Mother testified to the contrary, and the other evidence in the record supports Mother. Father did testify that he was responsible for all of the care that the boys received. However, it is more accurate that when Father worked daylight, Mother worked as a waitress from 4:00 or 5:00 p.m. until somewhere between 11:00 p.m. and 2:00 a.m. in order to avoid leaving the children with a babysitter. When he worked second or third shift, she worked daylight. N.T., vol. 2, at 103–04. When Mother was not working in the evening, she was responsible for meeting the children's physical needs. *Id.* at 88. During the day, Father was gone from 7:00 a.m. until 3:00 p.m., and Mother cared for the children.

The record also supports the conclusion that Mother was forced to work due to the financial instability occasioned by Father's frequent unemployment. In the eighteen months that the family lived in Pennsylvania, counting from the time they moved from Rhode Island in July, 1990, until Mother and the children left on February 7, 1992, Father's own testimony established that he had been laid off four different times and has held four different jobs. N.T., vol. 1, at 35.

When both parents are otherwise fit, one parent's role as the child's primary caretaker may be given weight as a determining factor by the court. *Mumma v. Mumma*, 380 Pa.Super. 18, 550 A.2d 1341 (1988). In the instant case, there are two problems with the application of this doctrine. First, it comes into play only when the parties are equally fit. In light of Father's violent and abusive nature, which we discuss *infra*, clearly the parties are not otherwise equally fit. Second, even if they were, the evidence tends to establish that during the time that Father was working daylight and Mother was working second shift, the parties functioned as equal caretakers of the children. At other times, Mother functioned as the primary caretaker.

The trial court, in addressing this issue in its supplementary opinion dated January 6, 1993, evaluated the parties' roles only during the time that Father worked daylight and Mother worked evenings. Moreover, even though the court determined that "there was a paucity of evidence from which we could evaluate [the parties'] suitability for [Zachary]," it went on to make findings on this issue without adequate support in the record.

The trial court's attitude throughout the proceedings is troubling. Father and all of his family witnesses are lifelong residents of Carbon County. Mother is a native of Rhode Island who found her life in Carbon County intolerable, mostly due to Father's abuse, but also due to the controlling nature of her husband's family and the lifestyle they led. She went so far as to testify that life in Rhode Island provides "a lot to do, more so ... than anything here. Here was total woods. It was more of a man's job to go out and shoot the BB gun or go out and shoot the bow and arrow or—whereas we do things that anyone could participate in, male or female." N.T., vol. 2, at 72.

As to Father's family, it is clear, their protestations to the contrary notwithstanding, that they did not approve of Mother. Mother and all of Father's witnesses testified at length concerning the unacceptability to Father and his family of Mother's job as a waitress and Mother's alleged unwillingness to pursue an education. The tone and tenor of the trial court opinions also present a subtle bias against Mother for unacceptable and unsupportable reasons. For example, in assessing Mother's credibility, the trial court stated, "[W]e conclude mother exaggerates. Several factors support this conclusion. First, during our hearing mother aspired to appear sophisticated. This attempt was frequently belied by bad word usage and pronunciation." Trial court opinion, 10/15/92, at 5. In the first place, we fail to see the court's logic that a person who uses poor grammar or pronunciation is prone to exaggeration. More importantly, however, a person's use of grammar and pronunciation absolutely has no effect on whether that person is either a credible witness or, more importantly, a good

parent. Mother testified that she quit high school during her senior year because she was pregnant with her first child. One might expect someone with this background to present with less than flawless speech. Further, if the court is interested in analyzing the ungrammatical and improper word usage of the witnesses who appear before it, we suggest a more balanced analysis, as the same language usage was exhibited by Father. N.T., vol. 1, at 16, 19, 21, 27, 42–43, 51–53.

Second, the trial court determined Mother to be incredible based upon her testimony that she had overcome her abuse of alcohol while living with Father in light of "her acknowledged history of alcohol abuse and the recurring nature of its more serious cousin, alcoholism." Trial court opinion, 10/15/92, at 5. Again, the trial court's factual finding and its inference are not supported by the record and reflect the trial court's subtle bias against Mother. A reading of the notes of testimony establishes that Father and his family are heavy drinkers. The focus of all family get-togethers was alcohol. Mother acknowledged this pattern of drinking and described it as one of the reasons she left Pennsylvania. N.T., vol. 2, at 50, 53, 81. In fact, she presented evidence of her completion of Codac, a program of alcohol abuse counseling which involved the administration of breathalizer and urinalysis testing. She also enrolled the children in DARE, a substance abuse program, in Rhode Island. The report from Codac states that Mother does not require further treatment and that all breathalyzers were negative. The trial court refused to credit this report and determined, based on its disbelief that Mother could not have overcome her alcohol-related problem in such a short period, that Mother was an incredible witness. Clearly, the court's factual finding on this issue, and the inference therefrom is not supported by the record.

Most telling on this issue of alcohol abuse is the pervasiveness of it throughout the record, and yet Father and his witnesses all refuse to acknowledge it as a problem. During the hearing, the trial court commented on it, yet ignored it when setting forth its factual findings. The trial court stated:

Let me say this to counsel. I mean, you've—with all your witnesses, your documenting, you're beating a dead horse at this point on the alcohol. I mean, we've concluded that there's some—there was one comment by a witness earlier that said that the arguments were always preceeded by drinking—or primarily. We accept that that was going on; and I think, if the truth be known, all the witnesses would say they would have liked to have seen everybody go get help.

N.T., vol. 2, at 32. Yet, when determining credibility, the trial court found Mother incredible based upon her testimony that she had addressed her alcohol problem, as supported by the report from Codac, and did not find Father incredible based upon his testimony that he had no problem with alcohol. Yet all of the testimony, including that of Father, established Father as a heavy drinker who became extremely loud and violent. The night before Mother left the marital residence, she had been working. Father arranged for a babysitter and went out drinking with a friend. Although the babysitter had to be home at 10:00 p.m., Father called her and asked her to call her parents so that he could stay out longer. He arrived home about 11:00 p.m., with his drinking companion, and Mother arrived home from work shortly thereafter. Father was angry that Mother was upset about his going out drinking and stalked out of the house, telling Mother she could not tell him what to do and how to do it. *Id.* at 55.

When he returned at 3:30 or 4:00 a.m., again with his drinking partner and tried to go to bed with Mother, she told him to sleep on the couch. What transpired after that differs according to the parties. Mother testified that Father punched her and dragged her out of bed by her hair. Father testified that any blows Mother received resulted from his efforts to defend himself. Both parties agreed that the children, crying and screaming, witnessed the incident. Mother and the children left the next day.

The trial court's only comment about the incident which culminated in the parties' separation, was that "mother's highly emotional state ... gave father's claim of limited self-

defense a ring of truth. We could easily see her provoked by father's unannounced night out with a family friend." Trial court opinion, 10/15/92, at 6. There is no basis in the record for such a conclusion. On the other hand, we find little Zachary's testimony quite significant. The trial court completely ignored it, saying only that the "brief testimony of Zachary was not helpful. . . ." Trial court opinion, 1/6/92, at 4. We believe it is one of the only truly objective pieces of evidence in the record. The court asked Zachary if he would like to see both Mother and Father, and Zachary replied, "They don't live together now." The trial court followed with, "Do you wish they did?", to which the child replied, "Uh-huh. No, I don't, 'cause my dad hits her." Notes of Testimony, 8/26/92, at 9.

The bias of the trial court against Mother and the resulting findings that are unsupported by the record are numerous, and we need not underscore every one. We will note, in addition to the findings above, that the court discounted the testimony of Mother's witnesses based upon the fact that they were family and friends but did not similarly reject the testimony of Father's witnesses, who were all family except one. Moreover, the trial court concluded that "[t]here were no serious contentions that father had an alcohol problem," yet at the hearing, the court acknowledged the significant effect alcohol played in the dynamics of this family, as noted *supra*.

It is clear to us that the failure of the trial court to consider the whole family doctrine and to apply properly the primary caretaker doctrine, coupled with the pervasive bias against Mother and the improper and unsupported factual findings, require that this case be reversed. In concluding that Zachary should reside with his siblings and Mother during the school year beginning September 1, 1993, we are mindful that Zachary has not been with Father since February, 1993. Therefore, from the date of this order until August 31, 1993, Father will have primary physical custody of Zachary. Beginning September 1, 1993, Mother will have primary physical custody during the school year. The trial court, on remand,

will enter an appropriate order providing for summer visitation with Father in addition to determining holiday visitation.

Order reversed and remanded for entry of an order consistent with this Memorandum. Jurisdiction relinquished.