**Crowell v. Lasker**

C.P. of Monroe County, no. 1135 D.R. 2002.

*Rebecca Craggs,* for plaintiff.
*Kimberly Fedrigon,* for defendant.

ZULICK, *J.,* March 14, 2006—This is a custody dispute between Wayne D. Crowell (Father) and Tia E. Lasker (Mother), who are the parents of Nathaniel R. Lasker, born September 25, 2002. Mother and Father were never married. Mother is single, age 25 and resides in Lodi, New Jersey. Father is 28 years of age and is married to Angie Crowell, age 27. They are temporarily residing in Cordova, Tennessee while repairs on their home in Slidell, Louisiana are being completed.

Custody litigation began in this county on September 13, 2004, when Father filed a complaint for custody. An interim custody order was entered on November 23, 2004, granting primary physical custody to Mother with Father having partial physical custody one weekend per month and one week over the Christmas holiday. The parties obtained home studies and psychological reports. They reached agreements between themselves to give Father time with Nathaniel this past summer and this past Christmas holiday.

A custody hearing was scheduled for September 20, 2005, but was continued at Father's request due to dam-

age to his home suffered during Hurricane Katrina. The hearing was held on February 17, 2006.

It is the decision of this court that the parties will share legal custody of Nathaniel. Mother will have primary physical custody and Father will have partial physical custody during the times specified in the accompanying order for the reasons which follow.

## FINDINGS OF FACT

(1) Nathaniel Lasker, son of Wayne D. Crowell and Tia E. Lasker, was born on September 25, 2002. He was a healthy three-year old at the time of the hearing. His mother was single, age 25, and his father, age 28, married to Angie Crowell, age 27.

(2) The parties were never married.

(3) Mother and Father were acquaintances while growing-up in Indian Mountain Lakes in Albrightsville, Pennsylvania, although Tia Lasker was three years younger than Wayne Crowell.

(4) The parties met again when Ms. Lasker was a junior in college at Indiana University of Pennsylvania and Mr. Crowell came home from Louisiana to visit his family.

(5) They met at the Shenanigan's Bar in Big Boulder and, after becoming acquainted again, Mr. Crowell invited Ms. Lasker to his apartment in New Orleans where she visited from December 30, 2001 until January 8, 2002. During that time they were intimate.

(6) On January 23, 2002, Ms. Lasker discovered that she was pregnant and called Mr. Crowell to notify him of that. He requested that she go to a doctor to confirm

the pregnancy. When she called him several days later to confirm that she was indeed pregnant, he denied that the child was his.

(7) Ms. Lasker again called Mr. Crowell in March of 2002, and in September 2002, advising him that she was pregnant with his child. He denied paternity and asked her to leave him and his family alone.

(8) Nathaniel was born September 25, 2002.

(9) Ms. Lasker graduated from college in December 2002, and was assisted by her family with support for necessities.

(10) She filed for child support from Mr. Crowell when Nathaniel was born, but the support office was unable to serve him with the complaint until March 2004.

(11) Ms. Lasker resided with a sister for six months and her brother in Wind Gap for one month. She was on public assistance during this time.

(12) She then decided to go back to work and obtained a job with a wholesale distributor, Manhattan Trading and Marketing. She went to San Diego for two months and then was transferred to South Hackensack, New Jersey, working as a human resources manager in that office. Her job required her to travel and she was in the field for long hours while her son was at her mother's home in Indian Mountain Lakes.

(13) Mother then moved to Lodi, New Jersey where she was living at the time of the hearing. Her mother assisted her with daycare or she obtained daycare while she worked.

(14) Mother's employer, Michael Madrigal, testified on her behalf, stating that she is a valuable employee

and that she will have flexible hours when necessary for daycare arrangements. He testified that although Ms. Lasker has traveled for her work frequently in the past, less travel is necessary now.

(15) Mother received no child support from Father until July of 2004.

(16) Nathaniel was in good health at the time of the hearing.

(17) Mother is a smoker but testified that she does not smoke in Nathaniel's presence.

(18) Until December of 2005, she did not have medical insurance for Nathaniel. In December of 2005, he became insured under Father's plan.

(19) Mother moved into the Lodi, New Jersey apartment in March 2004. She testified that her apartment in Lodi is in a nice neighborhood.

(20) Mary Lou Malloy of Catholic Social Services investigated Mother's home and found an excellent mother/son relationship to exist between Mother and Nathaniel. She found Mother's apartment to be adequate to meet Nathaniel's needs and the housekeeping standards to be excellent.

(21) In a typical day, Mother gets Nathaniel up between 6 a.m. and 6:30 a.m., they have breakfast and he goes to daycare. She spends a few minutes with him at daycare settling him down and she then goes to work. She picks him up at the end of the day. They do something before and after dinner and read at night.

(22) Mother was interviewed by Dr. John Abbruzzese, who wrote a psychological evaluation dated May 3, 2005. In the evaluation, Dr. Abbruzzese found Mother

to be self-sufficient, independent and decisive, self-assured, confident and resourceful. He concluded that "[t]here is no question that Ms. Lasker cares for her son, however she admits her inability to provide financially for him as well as Mr. Crowell can. She is a hard working young woman who is attempting to provide, as best she can, for the welfare of Nathaniel." Dr. Abbruzzese expressed concern that Mother had allowed her apartment (that she shared with Nathaniel and a roommate) to become a mess, and noted that she needs to gain security and stability in her life to properly care for Nathaniel.

(23) Mother's family and friends have established a support network for Mother and the minor child since the child's birth and have engaged in the caretaking of Nathaniel.

(24) Nathaniel has attended and continues to attend a daycare preschool for the last two years.

(25) Mother's employment allows her to take Nathaniel with her during some of the employment related travel. She is at times allowed to work from home by her employer.

(26) Mother's extended family lives in New Jersey and Pennsylvania and has regular contact with the child. Mother's family members have frequently cared for Nathaniel when Mother was away on business or when Nathaniel was ill.

(27) Like Mother, Father grew up in the Indian Mountain Lakes community, where his family moved when he was in middle school. He attended Pocono Mountain High School. After graduating, he attended Penn State and Northampton Community College, studying com-

puter science. He did not obtain a degree. His work experience has been in computer technology. At the time of the custody hearing, he worked for Lockheed Martin testing computer software in Millington, Tennessee. He intended to move back to Slidell, Louisiana in May 2006 and relocate his job with Lockheed there.

(28) After he was served with the support complaint, Father requested a paternity test. In May of 2004, Father's paternity was established.

(29) Father's wife, Angie Crowell, works as an occupational therapist. The Crowells are expecting a child in May.

(30) Father was interviewed by Dr. Abbruzzese for a psychological evaluation. Dr. Abbruzzese found Father to be "genuinely concerned and interested in Nathaniel's welfare." Page 2. He also found Father and his wife were willing to provide to the best of their abilities for Nathaniel's care.

(31) Father also had a home study done of his home by Bonnye G. Pardo A.C.S.W., L.C.S.W. of Slidell, Louisiana. She found the Crowell home in Slidell to be in an "upscale" neighborhood, and was in immaculate condition. Nathaniel has his own bedroom and there is an enclosed back yard for safe play. The social worker met both Father and his wife and concluded that "Mr. and Mrs. Crowell have a great deal to offer Nathaniel for optimal health, nurturing and well-being." Page 4 of home study report.

(32) Father is the fourth of five sons of Gordon and Laura Crowell. His family members do not live near his home in Louisiana but maintain regular close contact with each other.

(33) Angie Crowell's family lives near Father's home and Nathaniel has been accepted as a member of the family.

(34) When at his Father's home, Nathaniel wakes up around 7 a.m. and has breakfast with his Father and stepmother. During the time that Nathaniel has been with Father, Angie's grandmother has cared for him during the day when he and his wife are working. Father expects that his wife will work part-time after they have their child in May of 2006, and that it will not be necessary for Nathaniel to be in daycare full-time.

(35) The first time Father saw Nathaniel was Labor Day in 2004, when Mother allowed his parents to visit with the boy.

(36) Father's parents, Laura Crowell and Gordon Crowell drove Nathaniel to Louisiana to visit Father over the Christmas holiday in 2004. When they returned Nathaniel, they found the conditions in Mother's apartment, which she shared with a roommate, to be deplorable. A report was made to the New Jersey Department of Youth and Family Services which investigated Mother's home and eventually closed its file. Mother testified that the apartment was in poor condition because her roommate was in the process of moving out. There has been no suggestion that Mother's housekeeping is inadequate since that incident.

(37) Father and Angie Crowell arranged for treatment of Nathaniel's dental cavities following notice to Mother of Father's concern and Mother's failure to take the child to the dentist for a period of two months in the fall of 2005. Father noticed decay in Nathaniel's front teeth in September. He notified Mother about the problem, and

when it persisted, he took Nathaniel to the dentist who removed the front teeth in November of 2005. Mother testified that she did not have insurance or the funds to have Nathaniel's teeth repaired and that her doctor said that the tooth could be "watched."

(38) Nathaniel's maternal and paternal grandparents reside near each other in Indian Mountain Lakes Community in Albrightsville, Pennsylvania.

(39) Janice Lasker testified that she has a close relationship with Nathaniel and has provided care for him when her daughter was away on business. She talks to him daily on the telephone and sees him every two weeks. Before the custody complaint was filed, she arranged for the paternal grandparents to visit with Nathaniel.

(40) Father kept Nathaniel for two weeks at Christmas time when the agreement between the parties was that he would have Nathaniel for one week.

## DISCUSSION

The court's paramount concern in every custody case is for the best interest of the child. *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992). Where there is no order awarding primary custody to either parent before a request involving relocation, the court must scrutinize both as custodial environments under a best interest analysis before considering the *Gruber* relocation issue. *Kirkendall v. Kirkendall,* 844 A.2d 1261(Pa. Super. 2004). There is no presumption in favor of either parent. *Marshall v. Marshall,* 814 A.2d 1226 (Pa. Super. 2002).

Pennsylvania courts are reluctant to disturb existing custody arrangements which have satisfactorily served the best interest of the child. *Wiseman v. Wall,* 718 A.2d

844 (Pa. Super. 1998). Under the primary caretaker doctrine, the trial court is required to give positive consideration to the parent who has been the primary caretaker and a child should not be lightly removed from a parent with whom the child has lived since birth. *Swope v. Swope,* 455 Pa. Super. 587, 689 A.2d 264 (1997); *Wiseman v. Wall, supra* at 847. When both parents are otherwise fit, one parent's role as the child's primary caretaker may be given weight as a determining factor in a custody determination. *Wiskoski v. Wiskoski,* 427 Pa. Super. 531, 629 A.2d 996 (1993), *appeal denied,* 536 Pa. 646, 639 A.2d 33 (1994).

I am presented here with two parents who love their son and who are willing to make the commitment and the sacrifices necessary to be the primary custodial parent. Father is better able to meet Nathaniel's material needs and offers him a two-parent household with a spouse who has welcomed Nathaniel to their home. However, Mother has been the parent who has raised Nathaniel from birth and has struggled to become self-sufficient while she cares for her son.

Father became involved in Nathaniel's life after learning that Nathaniel was his child, but showed no interest before the birth and for almost two years after the child's birth. Father was told by Mother that he was Nathaniel's father when Mother became pregnant, but Father followed a course of terse denial that led to Mother taking the responsibility for Nathaniel on her own, without Father's help or support.

The first two years of Nathaniel's life were a challenge to Mother, who finished her college degree and found her first job after school while raising an infant by herself. Through hard work and persistence, she has found

stable employment and has provided a home for her son, leaving public assistance and becoming self-supporting. While her living circumstances are on a lower economic scale than Father's, she has an acceptable apartment for herself and her son and a network of daycare and family support that allows her to meet the demands of work and child-rearing.

I will not sever the bond that exists between Nathaniel and his mother now that Father has taken a sincere interest in his son's life. However, Father has raised some serious concerns about Mother's care of Nathaniel which I have also considered. Mother's apartment was in poor condition when the Crowell grandparents dropped Nathaniel off there in January 2005. This was fully investigated by the New Jersey Department of Youth and Family Services which closed its file without taking any action for Nathaniel's protection, and Mother's home study by Mary Lou Malloy reflected good attention to cleanliness and order in Mother's apartment now.

Another serious concern was that Nathaniel had cavities in one or both front teeth, which Father notified Mother about in September of 2005 and then had the teeth pulled by a dentist in the South when Mother took no action. Mother's explanation that she had no insurance and could not afford the treatment is not acceptable when Nathaniel has a health concern. No other evidence of this type of neglect was offered, and Mother now has child support and health insurance. This should eliminate any financial excuse for lack of proper dental care for Nathaniel.

Father also complained that Mother's work schedule kept Nathaniel shuttling back and forth from his grand-

mother's home in Indian Mountain Lakes and to daycare. It is true that Mother's work required her to travel between offices in the Mid-Atlantic region. Sometimes Nathaniel did stay for extended periods with his maternal grandmother, who has an excellent relationship with him. This was a consequence of a single mother trying to balance responsibilities of child-raising and a new career. Testimony from Mother and her employer supported the fact that Mother does not have to travel as much now and has some flexibility when child care needs interfere with her work schedule.

Father complained that Nathaniel was unkempt and smelled like smoke when he arrived in Louisiana. This was true in part because there was a very long automobile ride to Father's home on some occasions. Mother testified that she does not smoke in the house or expose her son to secondhand smoke. Father's parents also smoke, so the question of Nathaniel smelling like smoke after traveling in his parents' car may have resulted from their habits. As to Father's contention that Nathaniel was at times unkempt, nothing in Mother's psychological report or home study indicated that she neglected her son's basic hygiene, and I find that she has not. However, like dental and medical care, proper attention to Nathaniel's hygiene is the parents' responsibility and each is expected to be diligent about tending to it.

Finally, Mother complained that Father did not return Nathaniel after an agreed upon one week of custody over the Christmas-New Year holiday this year. The parties' custody order did not provide for holiday exchanges this year. Now that an order is being entered that governs the parties' custody of their son at all times, each party may reasonably expect this court to enforce its custody order.

I do not address the question of relocation because I do not find that Nathaniel's best interests require a relocation of primary physical custody.

## CONCLUSIONS OF LAW

(1) The best interests of Nathaniel are served by granting his parents shared legal custody with primary physical custody in his mother.

## ORDER

And now, March 14, 2006, following a hearing before the court at which plaintiff, Wayne D. Crowell, was present and was represented by Rebecca Craggs, Esq. and defendant, Tia E. Lasker, was present and was represented by Kimberly Fedrigon, Esq., it is ordered that all prior custody orders with respect to the parties' minor child, Nathaniel Lasker, age 3, are rescinded and the following order is entered:

### 1. *Shared Legal Custody*

Mother and Father shall share legal custody of their son. For purposes of this recommendation, "shared legal custody" shall mean:

(a) All decisions affecting the child's growth and development, including but not limited to education, choice of school, medical and dental treatment, religious training, athletic pursuits and extracurricular activities shall be considered major decisions, and shall be made by the parties jointly after discussion and consultation with each other with a view toward obtaining and following a harmonious policy in the child's best interest;

(b) Each party agrees to keep the other informed of the progress of the child's education and social adjustment. Each party agrees not to impair the parties' right to shared legal or physical custody of the child. Each party agrees to give support to the other in the role as parent and take into account the consensus of the other for the physical and emotional well-being of the child with the recognition that their life styles may be different;

(c) While in the presence of the child, neither party shall make or permit any other person to make any remarks or do anything which would in any way be construed as derogatory or uncomplimentary to the other parent. It shall be the express duty of each parent to uphold the other parent as one whom the child should love and respect;

(d) It shall be the obligation of each parent to make the child available to the other in accordance with the following schedule and to encourage him to participate in the plan hereby set forth;

(e) Each parent shall have the duty to notify the other of any event or activity that could reasonably be expected to be of significant concern to the other parent or to the child;

(f) The parents shall communicate with one another concerning any parenting issues requiring consultation and agreement regarding a proposed modification of the custody schedule which may, from time to time, become necessary, and shall specifically not use the child as a messenger at any time. Neither party shall discuss with the child any proposed changes to this schedule or any other issue requiring consultation and agreement prior

to discussing the matter and agreement with the other parent;

(g) With regard to any emergency decisions which must be made, the parent with whom the child is physically residing at the time shall be permitted to make a decision necessitated by the emergency without consulting the other parent in advance; however, that parent shall inform the other of the emergency and consult with him or her as soon as possible. Day-to-day decisions of a routine nature will be the responsibility of the parent having physical custody at that time;

(h) Mother and Father agree to share complete and full information from any doctor, dentist, teacher or other authority, and each parent may have copies of any reports given to them as a parent. Each parent shall also request any authority to forward copies to both parents at their respective addresses. Such documents include, but are not limited to, medical reports, athletic and school reports, birth certificates, etc. Both parents may and are encouraged to attend conferences and activities with the child. Both parents shall be listed with any school or day-care center as parents to be contacted in the event of an emergency and to be notified regarding school events. Mother and Father agree to share copies of any school notices in a timely fashion;

(i) Both parents shall attempt to avoid scheduling any activities or appointments for the child which would require his attendance or participation during the time when he is scheduled to be in the physical custody of the other parent without the parent's prior approval; however, both parents agree to cooperate and be flexible in accommodating the child's scheduled activities.

## 2. *Shared Physical Custody*

Mother and Father shall share physical custody of their son, with Mother having primary physical custody under and subject to Father's periods of partial custody, as follows:

(a) from 9 a.m. on April 22, 2006 until 5 p.m. on May 6, 2006;

(1) in future years before Nathaniel is in kindergarten, this consecutive two-week period shall be exercised in February, with 90 days notice to Mother, otherwise it shall be the first two weeks of that month, commencing at 9 a.m. on the 1st and concluding at 5 p.m. on the 14th. After kindergarten begins, this period of custody will cease.

(b) from June 3, 2006 at 9 a.m. until July 15, 2006 at 5 p.m.;

(1) in future years Father shall have custody from the first Saturday in June and then for six weeks. Once Nathaniel begins school, Father shall have custody of him from the second Saturday after school ends for a period of eight weeks.

(c) in September each year until kindergarten begins, for two consecutive weeks, with 90 days notice to Mother, otherwise it shall be the first two weeks of September. After kindergarten begins, this period of custody will cease.

(d) After kindergarten begins,

(1) Thanksgiving—Father shall have partial custody on Thanksgiving each year from the Wednesday prior to Thanksgiving at 5 p.m. through the Sunday following Thanksgiving at 5 p.m.

(2) Easter—Father shall have partial custody on Easter every year from the close of the last day of school before Easter until 5 p.m. on the day before school starts following the Easter holiday.

(3) Christmas—In even numbered years, Father will have custody for Christmas from 9 a.m. on December 24 until the day before school commences at 5 p.m. In odd numbered years, Father's period of Christmas custody shall begin at 9 a.m. on December 26 and end on the day before school commences at 5 p.m.

(4) Father may exercise custody for two weekends per month from Friday at 5 p.m. until Sunday at 5 p.m., upon 90 days notice to Mother, provided that Nathaniel shall not travel more than 250 miles from Mother's residence on those weekends without Mother's consent.

### 3. *Transportation*

Father will be responsible to provide all necessary transportation except summer periods of custody, and shall pay the costs of that transportation. Mother shall be responsible for all transportation and its costs for summer custody.

### 4. *Telephone Access*

Each parent shall allow the other parent to have private, liberal and reasonable telephone access with their son during that parent's period of partial custody. This shall include the child initiating such contact. Reasonable telephone access shall be construed to be during the child's normal waking hours, emergencies excepted. If the calling parent leaves a message at the residence of the custodial parent, the custodial parent shall require the child to return the telephone call to the noncustodial parent.