**Buck v. Buck**

*Denise M. Sebald,* for plaintiff.
*John A. Hoffert Jr.,* for defendant.

CAMPBELL, *J.,* April 22, 2008—A custody trial was heard in the above-captioned matter on March 28, 2008. At issue was the primary custody of Alexa Buck, age 7, born July 25, 2000. The court finds as follows:

## I. FINDINGS OF FACT

(1) Plaintiff William K. Buck III (Father) and defendant Christine M. Buck (Mother) are the natural parents of one child, Alexa Buck, born July 25, 2000.

(2) The parties were married October 27, 1999. They were divorced in December 2007. This was the second marriage for both parties. Mother admitted to certain actions which contributed to the dissolution of the parties' marriage.

(3) Father resides at 396 Sioux Court, Sinking Spring, Berks County, Pennsylvania. He owns a four bedroom house, which is the former marital residence.

(4) Mother resides at 142 Bainbridge Circle, Sinking Spring, Berks County, Pennsylvania. Mother rents this three bedroom house. Mother, Mother's sister Michelle Sparacio, the child, and Mother's other child from a previous marriage live at this address. Mother's current boyfriend, Jerry Burkhead, has lived at this residence in the past, but did not live at the house at the time of the trial.

(5) In June 2006, Father filed a divorce complaint with a custody count.

(6) In September 2006, the parties reached a custody stipulation whereby they would equally share legal and physical custody of the child. They have been equally sharing physical custody of the child ever since. Currently, they alternate weeks of custody, exchanging the child on Friday at 6 p.m.

(7) Father filed a petition to modify the custody order in December 2006. In September 2007, this court dismissed that petition for procedural reasons. Father immediately filed a new petition to modify, and that petition led to this custody trial.

(8) From the child's birth until the child was 4 years of age, while the parties were married and living together, Mother was the child's primary caregiver during the day.

(9) Father has a B.S. degree in computer science from Elizabethtown College.

(10) Father is employed by Metro Technology Services Inc. where he has worked for the last nine years. Father is a computer programmer/software developer. He earns $85,000 a year.

(10) Mother obtained a G.E.D. Additionally, she is a registered medical assistant, certified E.M.T., and C.P.R. instructor.

(11) Mother is employed by Y.T.I. Career Institute where she has worked since January 2008. She works as a medical assistant instructor. She is also a C.P.R. instruc-

tor at a Lancaster hospital. Mother's current annual income is approximately $35,000.

(12) The child at issue, Alexa, has a biological half-sister who lives primarily with Mother. Alexa also has a biological half-brother, Brandon, who used to live primarily with Mother, but currently only visits.

(13) Mother has a history of mental illness including multiple suicide attempts.

(14) The parties live in the same school district.

## II. DISCUSSION

Entering trial, Father seeks custody of the child Alexa Buck, born July 25, 2000. This court considered the testimony of Dr. Peter Thomas—the custody evaluator, William K. Buck III—Father, Christine M. Buck—Mother, Michael Carroll-Lugo—Mother's ex-husband, Brandon Lugo—Mother's son, Brianna Carroll-Lugo—Mother's daughter, Alexa Buck—parties' child, Steven Buck—Father's brother, and Amanda Sparacio—Mother's sister. This court considered the custody questionnaire that each party submitted; both parties stipulated the entry of the questionnaires into the record. Lastly, this court considered the exhibits proposed and admitted into evidence.

According to statutory law, in custody a trial court "shall consider the preference of the child as well as any other factor which legitimately impacts the child's physical, intellectual and emotional well-being." 23 Pa.C.S. §5303(a)(1). A trial is also to consider which parent is more likely to encourage the child's relationship with the

other parent, 23 Pa.C.S. §5303(a)(2), and any past violent or abusive behavior by either parent. *Id.* at (a)(3).

The Superior Court of Pennsylvania has held:

"It is settled law in Pennsylvania that a custody order is subject to modification *without proof of substantial change in circumstances* when it is shown that change is in the best interests of the child. Whenever a court is called upon to address the best interests of a child, traditional burdens or presumptions such as substantial change in circumstances, the fitness of one parent over another, or the tender years doctrine must all give way to the paramount concern; the best interests of the child. In determining best interests of the child, a court must consider all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being." *Jordan v. Jackson,* 876 A.2d 443, 452-53 (Pa. Super. 2005).

Mother has had a difficult life filled with abuse and depression and suicide attempts. This court has no wish to add to her sadness by analyzing her weaknesses as a parent. Unfortunately, the child's best interests are this court's responsibility, and Father's request for primary custody is premised primarily on the weaknesses of Mother. Father presents as a solid, dependable parent. The only method by which to determine whether the child would benefit by being in Father's custody more, and Mother's less, is to contrast the strengths and weaknesses of the parents and how these traits affect the child.

## A. *Physical Well-Being/Physical Environment*

The child is in good health. Mother's medical knowledge and training make her a better candidate to treat

any medical issues that could hypothetically arise for the child. On the other hand, Father's attentiveness to the child demonstrates that any physical difficulties would be noticed and acted on promptly. Thus, the child appears to be in equally good physical care with either parent.

Mother's house appears to have been crowded on occasion; recently, Mother and her boyfriend, her two daughters, her son, and her sister were all living in the three bedroom house. Since then, Mother's son has been sent to live with his father, and Mother's boyfriend has moved out, at least temporarily.[1] The child does appreciate living with her sister.

At Father's house there is plenty of room as only he and the child reside there, but less family company for the child. The child does have more friends in Father's neighborhood, the former marital residence.

Basically, the two houses appear to offer approximately equal physical environments. One caveat to this assessment is that there has been a great deal of conflict, some physical, at Mother's household. Physical injuries have occurred as a result of some of these conflicts in the household. While this conflict places the child at emotional risk, it does increase the child's chance of physical harm as well.

Additionally, Father appears more motivated and able than Mother to help the child regularly participate in extracurricular physical activities.

---

1. Neither Mother's sister who lives in the home, nor Mother's boyfriend testified at trial despite being listed as witnesses in Mother's pretrial memorandum. An employment conflict was offered as the reason why the sister did not appear on the day of trial.

Therefore, there is a slight advantage for the child's physical well-being in Father's custody.

## B. *Emotional Well-Being*

Father and Mother both love the child, and the child loves them.

As stated above, there has been conflict at Mother's household that negatively impacts the child's well-being. Mother and her boyfriend have had frequent disagreements that included yelling. At trial, Mother acknowledged that she yells a great deal. Additionally, there have been physical conflicts in Mother's household between Mother and son, Mother and boyfriend, son and sister: objects have been thrown; physical confrontations have taken place. The children have been fearful. This household violence is a strong negative for the child.

Mother is emotional and has a strong bond with the child. The child enjoys her time with Mother. Mother's own emotional problems appear to affect her ability to focus on her children. Despite Mother's strong nurturing abilities and bond, the evidence demonstrated that she has not always been there emotionally for the child; Mother has, somewhat frequently, focused her attention elsewhere.

Some of the child's emotional needs are met by the child's sister, but this behavior leads to another area for concern. In general, Mother appears to give the children responsibility beyond their years and to abdicate some parental responsibilities to her daughter, Brianna. At trial, Mother claims she has addressed this abdication of parenting problem. In Mother's testimony, she placed

more of the responsibility for Brianna's taking on her parental duties on Brianna than she accepted for herself, which was not a positive parental action.[2]

At Father's household, Father has focused on the child, maximizing his parental abilities and providing the child with consistent, stable care.

A parent acting reliably and consistently as a parent, not a friend, is an important trait for a primary caregiver. *King v. King,* 889 A.2d 630, 635 (Pa. Super. 2005). Overall, Father's household offers the child a superior emotional environment.

## C. *Intellectual Well-Being*

The child appears to be doing satisfactory in school. Mother teaches medical assistants as part of her employment, so she has some knowledge of the teaching process. Mother has participated to some extent in the child's education; however, overall, Father appears more knowledgeable about and involved in the child's schoolwork than Mother. The child does receive homework help from her sister in Mother's household.

In the end, Father's more stable, more disciplined household where more attention is being given to the child's schoolwork by a parent offers a slight advantage for the child's intellectual well-being.

---

2. There were a number of matters raised at trial which reflected poorly on Mother's judgment-making ability, yet Mother rarely took responsibility.

## D. *Spiritual Well-Being*

Father is religious and takes the child to church. Father currently places a high-level emphasis on religion. The child appears to be enjoying her religious activities.

Mother did not testify as to any particular religious/ spiritual activities in which she seeks to involve the child, or any religious/spiritual activities which she seeks to instill in the child.

The child's spiritual well-being is better served by being in Father's custody.

## E. *Child's Preference*

The child loves both parents and loves her sister. She prefers for the custody schedule to remain the same. However, the child is only 7 years old, and she did not articulate logical reasons for her preference. Some of her testimony revealed facts why maintaining the status quo would not be in her best interest. For all of these reasons, the child's preference is only a minor factor in favor of maintaining the equal physical custody division.

## F. *Parents' Credibility*

Parts of Mother's testimony were credible. Mother deserves credit for not alleging failings on Father's part where she did not perceive any. At times, Mother's demeanor and manner of testifying demonstrated credibility. On the other hand, some parts of Mother's testimony were evasive, and some parts of her testimony contradicted information she had given in her custody questionnaire. Father's testimony, including his demeanor and

manner, was straightforward and consistent, and, therefore, credible.

## G. *Sibling*

The Superior Court of Pennsylvania has held:

"[T]he policy in Pennsylvania is to permit siblings to be raised together, whenever possible (the doctrine of 'family unity' or 'whole family doctrine'). *Wiskoski v. Wiskoski,* 427 Pa. Super. 531, 535, 629 A.2d 996, 999 (1993), *appeal denied,* 536 Pa. 646, 639 A.2d 33 (1994). Absent compelling reasons to separate siblings, they should be reared in the same household to permit the 'continuity and stability necessary for a young child's development.' *Pilon v. Pilon,* 342 Pa. Super. 52, 56, 492 A.2d 59, 60 (1985). This policy does not distinguish between half-siblings and siblings who share both biological parents. *Davis,* [502 Pa. 110,] 124, 465 A.2d [614,] 621. However, this court has made clear that the policy against separation of siblings is only one factor— and not a controlling factor—in the ultimate custody decision." *Johns v. Cioci,* 865 A.2d 931, 942 (Pa. Super. 2004).

The child's brother (biological half-brother) who previously lived in Mother's household had created certain safety concerns. Mother testified that the brother "knocked her out" in regards to the child's sister, and that Mother called the police to file assault charges. It was unclear at the custody trial whether the brother would return to live in Mother's household in the future, or what danger he may or may not pose to his younger sister, the child at issue in this case.

Brianna, the child's sister, is a great positive asset to the child. The child benefits from time spent with her sibling Brianna (biological half-sister).

Father testified that he would be willing to facilitate the child seeing her siblings by having them over at his house. Father, who served as these children's stepfather for years, was credible in his testimony. Regardless, keeping the child together with her sister is a factor in favor of keeping the current custody order.

## H. *Expert Testimony*

When deciding a custody case, a lower court is obligated to consider the testimony of experts. *Rinehimer v. Rinehimer,* 336 Pa. Super. 446, 453, 485 A.2d 1166, 1169 (1984).

Dr. Thomas testified regarding the custody evaluation that he conducted on the parties in May 2007. During his evaluation, Dr. Thomas discovered many of the same facts that came out through other sources at this custody trial. Dr. Thomas recommended that the child reside primarily with Father. Dr. Thomas' recommendation was primarily based upon his finding that Mother was not properly involved as a parent. Dr. Thomas had some significant concerns regarding Mother's emotional health and recommended that she receive more psychological treatment. Mother put too much responsibility on the children and did not provide them with enough supervision, guidance, and teaching, Dr. Thomas testified.

Dr. Thomas' expert opinion appeared well-reasoned, and his views were supported by evidence that came

out at trial. Dr. Thomas' opinion is a strong factor in favor of the child spending more time in Father's custody.

## CONCLUSION

After reviewing all the evidence, and carefully weighing all the factors, it is apparent that the child's best interest would be served by her being primarily in Father's physical custody. Therefore, this court enters the following order:

## ORDER

And now, April 22, 2008, after a custody trial in the above-captioned matter, and in accordance with this court's accompanying opinion, it is ordered and decreed that:

(1) Plaintiff, William K. Buck III (Father) and defendant, Christine M. Buck (Mother) shall have joint legal custody of their minor child Alexa Buck, age 7, born July 25, 2000.

(2) The parties shall share physical custody of the child as follows:

(a) Father shall have primary physical custody of the child. Father shall have physical custody of the child at all times not otherwise specified in this order.

(b) Mother shall have physical custody of the child every other weekend. Mother's custody weekend shall begin from after school on Friday until Monday morning when Mother shall deliver the child directly to school.

(c) On the weeks preceding Father's weekend of custody, Mother shall have physical custody of the child on Wednesday from 5:30 p.m. until Thursday morning when she delivers the child to school.

(3) The parties shall alternate custody of the child on the following holidays: New Year's Day, Easter, Memorial Day, July 4th, Labor Day, and Thanksgiving. Mother shall have custody New Year's Day, Memorial Day and Labor Day in even-numbered years. Father shall have custody Easter, July 4th, and Thanksgiving in even-numbered years. In odd-numbered years, Father shall have custody New Year's Day, Memorial Day and Labor Day. In odd-numbered years, Mother shall have custody Easter, July 4th, and Thanksgiving. Holiday custody shall be from 10 a.m. until 8 p.m.

(4) Mother shall have custody of the child on Mother's Day and Father shall have custody on Father's Day. Mother's/Father's Day custody shall be from 10 a.m. until 8 p.m.

(5) The Christmas holiday shall be shared as follows: In even-numbered years Mother shall have custody from 6 p.m. Christmas Eve until 1 p.m. Christmas Day, and Father shall have custody from 1 p.m. Christmas Day until 8 p.m. December 26. The parents shall alternate the schedule in odd-numbered years.

(6) The parties shall each have the right to two non-consecutive weeks of vacation with the child each year. Notice of such a vacation shall be given to the other party by May 15 of each year. (In 2008 only, the deadline shall be June 1.) In the event of a conflict, Father's vacation plans shall have priority in even-numbered years

and Mother's vacation plans shall have priority in odd-numbered years.

(7) The vacation custody schedule takes precedence over regular custody time. The holiday custody schedule takes precedence over vacation time and regular custody time.

(8) Both parties shall cooperate in helping the child participate in any extracurricular activities (*e.g.,* soccer/cheerleading) that the child wishes to participate in. Either party may attend any activity that the child participates in. Either party should try to help with transportation, etc. if an activity falls during his/her custody time.

(9) The parents shall share transportation with the parent receiving custody providing transportation of the child.

(10) The parties may modify the custody schedule through mutual agreement. Any such informal agreement can later be voided by either party unless the agreement is placed in writing and made a court order.

(11) The attached appendix [not published herein] is incorporated and made a part of this court order. The appendix's provisions must be followed as part of the court order except that if any part of the appendix conflicts with part of the above delineated court order the explicit court order provisions trump the appendix provisions.

(12) This case shall be scheduled for a status conference on Tuesday, October 21, 2008 at 11 a.m. in Courtroom 4A of the Berks County Services Center. Parties

and counsel shall be present for the status conference. Either counsel may request an additional status at an earlier date in the event the parties request assistance with his order.