## Shoup v. Cook

*Gregory A. Jackson,* for plaintiff.
*Jennifer B. Habel,* for defendant.

ZANIC, *P.J.,* April 3, 2014—

## MEMORANDUM

The court is called upon to determine the custodial rights of Jeremy Shoup, the natural father of Tristan Hamman, born July 17, 2002, and Joseph Cook, the young man's stepfather.

This case began in 2006 when plaintiff filed a complaint for shared custody against the natural mother, Angela Cook. The parents entered into a custody agreement pursuant to a stipulation on May 22, 2006. Sadly, Angela Cook passed away on September 29, 2012.

On October 29, 2012 a praecipe to amend caption was filed which substituted Joseph Cook as the defendant in this case, replacing Angela M. Hamman (Cook).

Also on October 29, 2012, plaintiff and defendant entered into a stipulation providing that the parties would share legal custody of Tristan, and that the stepfather would be the residential custodian of Tristan subject to periods of

partial custody for the natural father. This stipulation was adopted as an order of court.

On October 21, 2013 father filed the instant petition to modify custody requesting that he be awarded sole legal custody and primary physical custody of Tristan subject to the right of defendant to have periods of partial custody. A custody conference was held on November 25, 2013, at which time the case was listed for full hearing. That custody hearing was held on January 29, 2014.

We begin by pointing out that the parties do not present on equal footing. In this regard, even though a stipulation was signed by father and this court entered an order in October of 2012 giving stepfather residential custody of Tristan, the natural parent is nonetheless entitled to a prima facie right of custody. See, *Jordan v. Jackson*, 876 A.2d 443 (Pa. Super 2005).

Likewise, "in any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent maybe rebutted by clear and convincing evidence." 23 Pa.C.S.A. § 5327(b). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re B.C.*, 36 A.3d 601, 605-606 (Pa.Super.2012).

In fulfilment of the statutory requirements and the guidance from our appellate courts, this court has received evidence relevant to the child's best interest, and must decide whether the evidence presented on behalf of stepfather is weighty enough to bring the scale up to even, and down on his side. *See V.B. v. J.E.B.*, 2012 PA Super

200, 55 A.3d 1193,1199 (Pa. Super. Ct. 2012), citing *McDonel v. Sohn*, 762 A.2d 1101, 1107 (Pa.Super.2000) (quoting *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512, 513-514 (1980)).

Initially, we note that the Pennsylvania Supreme court considered a comparable case involving a custody contest between a stepfather and the natural father following the death of the mother. See *Charles v. Stehlik*, 560 Pa. 334, 744 A.2d 1255 (2000). The court affirmed primary custody in the stepfather, stating that unlike other states, in Pennsylvania it was not necessary for a party in loco parentis to establish that the biological parent was unfit before he or she could obtain primary custody. Rather, the court reaffirmed the standard as follows:

> It is axiomatic in custody cases that "the fundamental issue is the best interest of the child." *Ellerbe v. Hooks*, [490 Pa. 363,] 416 A.2d 512, 513 (Pa.1980). In a custody contest between two biological parents, "the burden of proof is shared equally by the contestants...." Id. Yet, where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, "the parents have a 'prima facie right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the [biological] parents' side." *Id.* at 514 (quoting *In re Hernandez*, [249 Pa. Super. 274,] 376 A.2d 648, 654 (Pa. Super. 1977))... (W)hile this Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child.

744 A.2d at 1257-1259.

22

In *Ellerbe*, supra at 514, our Supreme Court held that "these principles do not preclude an award of custody to the nonparent. Rather they simply instruct the hearing judge that the nonparent bears the burden of production and the burden of persuasion and that the nonparent's burden is heavy." The Supreme Court determined that, "where circumstances do not clearly indicate the appropriateness of awarding custody to a nonparent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents." *Ellerbe*, supra at 514.

As such, our duty in this case is to utilize the factors set forth by legislature in 23 Pa. C.S.A. § 5328 in analyzing the evidence and to thereby determine what is in the best interest of Tristan. In this regard, we must weigh the evidence in a manner that affords to the plaintiff the evidentiary advantage he enjoys as a parent. We will consider each factor individually:

*(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party?*

The testimony is undisputed that the parties have communicated and cooperated since the untimely death of Tristan's mother. Stepfather was instrumental in encouraging visits to anger management classes in an effort to enhance the child's relationship with the child's father, prior to mother's passing. Quite compelling was the testimony of stepfather that "(w)e have gotten along. Even over the past year. You know, there has been a little bit of contention here with the court hearings, but before then, even in the last year, very flexible. We have worked with each other. I have never kept him from him when he has asked to go see him. I have never denied it. We have gotten along. We have worked holidays out and everything." (T.T. 24).

Stepfather has even arranged to give father additional visitation since the entry of the order entered in 2012.

The court is quite concerned, however, with the nonsensical testimony of father relating to his reasons as to why legal custody should not be shared. (TT 59-61). The statement of father, that "(b)ecause honestly, the doctor that he goes to now might not be the best physician for him. There is always somebody better," (T.T. 60) is curious. Father has shared legal custody of Tristan for seven years, however, he now takes the opportunity to announce that he will do better if given sole legal custody. This court was not impressed with the second-guessing nature of father's testimony.

Also telling is the tone of father's testimony when he was asked if Tristan was a good kid, and he stated that "Couldn't ask for a better kid. His mother did an exceptional job with him." (T.T. 72.) The court notes that this was an unnecessary and disdainful jab at stepfather. Stepfather has been the primary caretaker of Tristan since Angela's death, and the obvious negative attitude and lack of appreciation for the stellar job that stepfather has done in raising this young man is a sign of things to come should father become the primary legal and residential custodian.

This court is convinced beyond any doubt that stepfather has and will continue to encourage and permit frequent and continuing contact between the child and his father, and as such this factor weighs heavily in his favor. The court is also convinced that should father obtain the control he seeks, the solid influence and guidance of stepfather will be substantially diminished.

*(2) The present and past abuse committed by a party or member of the party's household, whether there is a*

*continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.*

No relevant evidence was presented to consider this factor.

*(3) The parental duties performed by each party on behalf of the child.*

Since Tristan's mother passed away, stepfather has been the primary caretaker of Tristan, and stepfather has ensured that all of Tristan's medical needs have been attended to on a daily basis. Stepfather has taken Tristen to the vast majority of his medical appointments. Tristan's medical issues are of much greater concern than an average child. Stepfather has easily persuaded the court that he has excelled as a primary caretaker and that he would continue to do so in the future.

In contrast, father, was not able to identify Tristan's dentist, his vision therapist nor his dermatologist. Clearly father is involved with his child and a capable parent, however, he has not participated in the day to day involvement as the primary caretaker which has been successfully undertaken by stepfather. Father has had limited involvement with the Tristan's teacher this year, but stepfather has taken the lead in the educational aspect of Tristan's life as well.

*(4) The need for stability and continuity in the child's education, family life and community life.*

This factor weighs very heavily in favor of defendant. Tristan has undoubtedly undergone significant trauma in his life with the loss of his mother. Stepfather has been and will continue to be the stabilizing force in Tristan's life, and to change residential custody now

would be detrimental and certainly not in his best interest.

If this court were to change residential custody, it is unclear where Tristan would go to school. Although everyone agreed that Tristan should stay in his present school, there was only speculation as to how to accomplish that task should father become the residential custodian.

Father speculated regarding the paying of tuition to keep Tristan in the Southern Huntingdon County School District, and he testified that he was looking for real estate in the Southern Huntingdon County School District. This court is not persuaded by the testimony of father in that regard, and it is not appropriate to render a decision on what might happen. Stepfather has also indicated a possibility of moving his family home, while staying in the same school district, the stability factor still remains in favor of plaintiff.

Through his testimony, the court was able to learn a great deal about stepfather's background and the make-up of the current situation with Tristan. We learned about the residents of his home, and most importantly we learned about stepfather's fiancee, Mandy Davis, and her role in assisting with the child-care and assisting Tristan with his homework. She has been a positive factor over the course of the past year in the upbringing of Tristan, and there can be no doubt that she will continue to be a very positive influence in Tristan's life. She is by no means a replacement for his mother, however, the court cannot ignore her everyday role in assisting with the raising of Tristan.

It is quite curious, however, that we only know the name of father's fiancee, Rebecca Wright, but know

nothing else about her. Granted Tristan testified that he gets along with her; however, there was no testimony regarding who she is and the role she might play in Tristan's life. Obviously, when making a decision as to where a child is going to live, great care has to be undertaken in determining the make-up of each household and whether stability will be provided.

This court is being asked to speculate regarding the appropriateness of father's household. Tristan has done as well as can be expected for a child who has lost his mother. Continued stability is essential, and the stability factor weighs heavily in stepfather's favor.

*(5) The availability of extended family.*

Due to the breakdown of the relationship between stepfather and the maternal grandparents, this factor weighs in favor of father. It is clear that plaintiff has made an effort to include grandparents in Tristan's life, and there can be no question that the maternal grandparents must be involved in Tristan's life. This court would suggest that the parties cooperate to ensure that the grandparents, who live next door to stepfather, are a constant factor in Tristan's life. While procedurally the court does not have the ability to grant visitation to grandparents at this time, there can be no question that for the benefit of Tristan, the relationship between stepfather and grandparents must be mended. It is strongly suggested that stepfather permit frequent contact with grandparents while Tristan is in stepfather's care. The animosity created between grandparents and stepfather is not lost on Tristan, and that creates a very heartbreaking set of circumstances.

*(6) The child's sibling relationships.*

If plaintiff gets his wish as to the custody order, Tristan would see his half-brother and half-sister only every other weekend. That result is unacceptable. The policy in Pennsylvania is to permit siblings to be raised together, whenever possible (the doctrine of "family unity" or "whole family doctrine.") *Wiskoski v. Wiskoski*, 427 Pa. Super. 531, 629 A.2d 996, 999 (1993), *appeal denied*, 536 Pa. 646, 639 A.2d 33 (1994).

Absent compelling reasons to separate siblings, they should be reared in the same household to permit the "continuity and stability necessary for a young child's development." *Pilon v. Pilon*, 342 Pa. Super. 52, 492 A.2d 59, 60 (1985). This policy does not distinguish between half-siblings and siblings who share both biological parents. *In re Davis*, 502 Pa. 110, 465 A.2d 614. The factor while important is only one important factor — and not the controlling factor — in the ultimate custody decision. *See, e.g., E.A.L. v. L.J.W.*, 443 Pa. Super. 573, 662 A.2d 1109, 1118 (1995); *Cardamone v. Elshoff*, 442 Pa. Super. 263, 659 A.2d 575, 583-84 (1995); *M.D. v. B.D.*, 336 Pa. Super. 298, 485 A.2d 813, 816-17 (1984).

The sibling factor clearly and overwhelmingly weighs in favor of defendant. Tristan has been raised with his half-siblings, Alexander Cook and Emma Cook. At the time of the hearing, Alexander was six years old and Emma two. Cancer has taken his mom from him, and this court is not inclined to have the legal system take him from his siblings. While circumstances dictate that Tristan spend significant time away from Alexander and Emma we will make every effort to construct an order that ensures that Tristan has a healthy and long lasting relationship with his half-brother and half-sister.

*(7) The well-reasoned preference of the child, based on the child's maturity and judgment.*

Tristan indicated that he would prefer to live with his father, however, he had a difficult time explaining why he wanted to do so. Although it would be difficult for any young child to explain his reasons, Tristan had an exceptionally difficult time coming up with any reasons. Father was clear on the witness stand that one of the main reasons he has proceeded with his efforts to obtain custody was due to the persistence of Tristan. The court, however, does not see this as a compelling reason based on the young age of Tristan and his inability to provide an explanation, or any credible reason for the preference.

*(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.*

No relevant evidence was presented to consider this factor.

*(9)(10) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs, and which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.*

Defendant is more likely to succeed in the long term in these areas. As pointed out by counsel for stepfather, "the best predictor of future behavior is past performance....." (Brief of defendant p. 10). Stepfather has been vigilant in all developmental aspects of Tristan's life and there is no reason to believe that this will change. Tristan is a wonderful young man due to his upbringing thus

far, and many people have played a significant part in Tristan's development. While the evidentiary burden is on stepfather, his role in raising Tristan cannot be ignored. Defendant has been a constant in Tristan's life. Tristan has medical and educational needs that have been taken care of almost exclusively by stepfather over the course of the past year, and stepfather will continue to ensure that this will happen in the future. The credible emotion and love that projected from the witness stand during stepfather's testimony was noted.

*(11) The proximity of the residences of the parties.*

The parties live only 20 minutes apart; however, they live in different school districts.

*(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.*

Each party has an ability to provide adequate and appropriate child care, and it is anticipated that maternal grandparents and Mandy Davis will continue to play significant and appropriate roles in this area when the parties are working.

*(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.*

This court finds that the parties have and will cooperate in the future for Tristan's sake. The only significant level of conflict is the pronounced negativity directed toward stepfather from some members of mother's family. While those mentioned are not parties to this action, it should be addressed in the future to ensure that those who love and care for Tristan are able to

work together for the sake of Tristan's development.

*(14) The history of drug or alcohol abuse of a party or member of a party's household.*

No relevant evidence was presented to consider this factor.

*(15) The mental and physical condition of a party or member of a party's household.*

No relevant evidence was presented to consider this factor.

*(16) Any other relevant factor.*

Many people have been involved in raising Tristan, undoubtedly with the greatest contribution coming from his mother. Until today, those involved have done an admirable job. Tristan is a polite and respectful young man who will succeed in the future. It is our hope that those involved in Tristan's life will continue to work together for the benefit of Tristan.

Wherefore, based on the foregoing, this court finds by clear and convincing evidence that the best interests of Tristan will be met with entry of the preceding order.

## ORDER

And now, this 3rd day of April, 2014, it is the order of this court that the parties shall share legal custody of Tristan Hamman, born July 17, 2002.

It is the further order of court that residential custody of Tristan Hamman shall be as follows:

1. During the school year, stepfather, Joseph Cook, shall have primary residential custody of Tristan subject to the right of father, Jeremy Shoup, to have

partial residential custody three weekends each month from Friday at 6 PM until Sunday at 6 PM;

2. During the summer vacation from school, father and stepfather shall alternate weeks of residential custody of Tristan. Specifically, starting at 6 PM on the first Sunday after the conclusion of the school year, father shall have residential custody until the following Sunday at 6 PM. The summer weeks shall thereafter alternate between father and stepfather until the final Sunday prior to the start of school year, with the exchange taking place at 6 PM each Sunday;

3. Natural father shall have partial residential custody of Tristan from December 25th at 2 PM until December 31st at 2 PM;

4. The parties shall alternate the following holidays; Easter, Memorial Day, July 4th, Labor Day and Thanksgiving;

5. The party not in custody shall provide transportation;

6. The "appendix to custody order" shall be attached hereto and incorporated into this order.

7. No party shall be permitted to relocate the residence of the child to significantly impair the ability of another person to exercise custody unless every individual who has custody rights to the child consents to the relocation. A person proposing relocation must comply with the requirements pursuant to PA. C.S.A. Section 5337(c).

So as not to disrupt the routine of Tristan during this school year, the residential custody portion of this order shall begin on the first Sunday following the conclusion of school in June, 2014. Until such time, the October 29, 2012 order of this court shall remain in place.