262

## ORDER

**M.B. v. S.S.**

C.P. of Indiana County, no. 11468 CD 2002.

*Andrew Skala,* for plaintiff.

*James D. Carmella,* for defendant.

HANNA, *J.,* February 9, 2007—This matter comes before the court on the defendant/Father's petition to modify custody and the subsequent hearings thereon. For the reasons set forth below, the plaintiff/Mother is granted primary physical custody of M.S.

## ·FACTS AND PROCEDURAL HISTORY [1]

S.S. (Father), and M.B. (Mother), met while attending Indiana University of Pennsylvania and were involved in an intimate relationship. On March 22, 2002, a child, M.S., was born out of wedlock. During July/August 2002, Father and Mother's relationship ended, and Mother moved from Indiana, Pennsylvania back to her hometown, Norristown, Pennsylvania.

On August 15, 2002 Mother filed a petition for protection from abuse against Father in Montgomery County. Mother and the child were named as protected parties. A final order of court in the protection from abuse action was entered on October 1, 2002 after hearing. Father did not appear at this hearing. The final order granted Mother's petition and excluded Father from Mother's residence in Norristown for a period of 18 months. Mother was also awarded "full legal and physical custody" of M.S. "subject to a full custody hearing in Indiana, PA." (Plaintiff's exhibit A.)

---

1. The court derives these facts from the pleadings and the testimony and evidence offered at the hearings. The hearing testimony on September 19, 2006 was transcribed and the court has made reference to this testimony when appropriate.

Mother initiated a custody action in Indiana County on August 30, 2002. An initial custody conference occurred on October 29, 2002. As a result the parties entered into a temporary custody order dated November 1, 2002. The temporary custody order granted Mother primary physical custody and Father partial custody on alternate weeks between November 3, 2002 and December 21, 2002. The order also required Father to provide all transportation to and from his periods of partial custody.

On December 19, 2005, Father filed a petition to modify custody. In his petition, Father stated that the parties had been sharing physical custody on a weekly basis since November 2002. They exchanged M.S. each Sunday, with Father providing all transportation to and from Norristown.

On February 13, 2006, Father filed a petition for special relief. His petition alleged that on February 5, 2006, the day before Father was to pick the child up, he received a call from Mother stating that she had taken the child to the emergency room because M.S. had a serious illness. Mother told Father that M.S. had trouble walking and that the doctor had recommended M.S. not travel. Father, who was in the Philadelphia area when he received Mother's call, consulted with the treating physician, who countermanded her previous no travel recommendation. Father also alleged that M.S. was walking with no problems, so he took her for his week of custody. During that week, Father took M.S. to a doctor, who found no health problems. Based on this incident, Father refused to return the child to Mother on February 12, 2006. On February 27, 2006, Mother filed an answer to Father's petition for special relief, stating that M.S.

was diagnosed with toxic synovitis and hip pain. On February 27, 2006, this court ordered the parties to comply with the November 1, 2002 order, and awarded Mother a make-up week of custody.

The parties attended a mediation conference on March 20, 2006. As a result of this conference the parties agreed to participate in psychological evaluations and a child custody evaluation with a custody evaluator from Pittsburgh, Pennsylvania. The custody evaluator submitted his psychological evaluation for custody on July 21, 2006. On August 1, 2006, Father filed a motion for hearing.

This court held evidentiary custody hearings on September 19, September 20, and December 6, 2006. Testimony was taken from Father; Mother; the custody evaluator; Father's wife, K.S.; the maternal great grandmother, J.H.; the maternal uncles, R.B. and L.B.; and Mother's friend, J.S. Other than the parties, witnesses giving testimony were sequestered.

Following the close of testimony the court requested counsel to present partial custody proposals from each parent based on the other parent having custody. Father's proposal provides for two weekends a month, one to be exercised in Indiana on a long weekend during the school year and the other to occur in the Philadelphia area. During the child's school summer vacation, Father suggests alternating custody on a two week, one week basis, with Father having the longer custodial period. Mother would like the entire summer with partial custody in Norristown on alternate weekends for Father. She has stipulated that the child must sleep at her residence during these weekends. During the school year, Mother would have all

four-day weekends at her home in Norristown. She also requests the right to visit M.S. two weekends a month in Indiana, with the child staying overnight at Father's residence.

Counsel also provided the court with legal briefs on the issue of separation of siblings and an analysis of the testimony.

After carefully considering all the testimony and evidence presented at these hearings and performing a thorough best interest analysis, this court grants primary physical custody of the child to Mother.

## DISCUSSION

In custody disputes, the best interest of the child is the controlling question and paramount concern. *Warren v. Rickabaugh,* 410 Pa. Super. 431, 600 A.2d 218 (1991). The rights of the parent are subordinate to the child's interests. *Gerber v. Gerber,* 337 Pa. Super. 580, 487 A.2d 413 (1985). The best interest standard requires a case-by-case determination of all the factors that may legitimately affect the "physical, intellectual, moral, and spiritual well-being" of the child. *Sawko v. Sawko,* 425 Pa. Super. 450, 454, 625 A.2d 692, 693 (2003).

Unlike many jurisdictions, the Pennsylvania Child Custody Law does not specify a list of relevant factors for the court's best interest evaluation. Instead, the court is required to consider "any other factor which legitimately impacts the child's physical, intellectual, and emotional well-being." 23 Pa.C.S. §5303(a). In addition to this general mandate, the Child Custody Law does require that the court consider the following:

(1) The preference of the child.

(2) Which parent is more likely to encourage, permit and allow frequent contact and physical access between the noncustodial parent and the child.

(3) Past or present domestic violence (as defined under the Protection from Abuse Act) of a parent or adult household member.

The court has considered these factors as well as other relevant factors in determining the child's best interests.

## 1. *Parental Preference*

Because of the geographic distance, the parties' shared physical custody arrangement will no longer be feasible when the child reaches school age in fall, 2007. Both parents want primary physical custody of the child.

Father informed the court appointed evaluator that he should have primary physical custody because he is more dedicated than Mother, both spiritually and financially. He also believes Mother is unstable due to her relocations during the past four years. Father did testify that he believes both parents were equally important. During testimony he told the court, "I would want M.B. to have as much time as she possibly could." (Hearing transcript, 9/19/06, p. 37.)

Mother told the custody evaluator that she should be awarded primary physical custody because she believes Father has attempted to alienate the child from her, based upon the child being baptized without her knowledge or consent and the child calling her stepmother "Mom."

## 2. *Reasonable Preference of the Child*

The child, M.S., was born March 22, 2002 and is currently age four. Counsel did not request the court to interview the child and it was agreed that the child is too young to express a preference. This was also confirmed by the custody evaluator.

## 3. *Primary Caretaker*

The parties disagree as to when their separation occurred and how involved each parent was with the child prior to separation. Father states that he told Mother to leave in early July 2002 and she went to reside with her brother in an apartment in Indiana and she left the child with him. During testimony, he characterized the separation and transfer of custody as follows: "M.B. left M.S. with me, so there was a two to three week period of time prior to me leaving for the trip." (Hearing transcript, 9/19/06, p. 16.)

Mother contends that separation occurred at the end of July and that Father retained physical custody following an abuse incident. Mother regained custody when Father left the child in her care during his 18-day trip to Jamaica in August 2002. Mother subsequently filed a protection from abuse petition on August 15, 2002 in Montgomery County, which awarded her temporary primary physical custody of the child. The protection from abuse hearing occurred in Montgomery County on October 1, 2002. Father did not appear for this hearing and Mother was awarded "full legal and physical custody subject to a full custody hearing in Indiana, PA." (Plaintiff's exhibit D.) On November 1, 2002, the parties

entered into a "temporary custody order." (Plaintiff's exhibit A.) This order established shared physical custody alternating on a weekly basis through December 2002. The parties have continued this weekly alternation of physical custody since this time.

During testimony, Father denied that Mother was the primary caretaker from the time of the child's birth until the parties' separation. He explained that he did not agree "100 percent" with the characterization of Mother as the primary caretaker. (Hearing transcript 9/19/06, p. 62.) Father did concede that he didn't change very many diapers during the period prior to separation. (Hearing transcript 9/19/06, p. 61.)

Mother asserts she was the primary physical custodian of the child until separation because Father worked and she was not employed. She stated that Father worked from 8 a.m. until 7 p.m. at his business and on weekends. Because Father was opening a new office during this time, he was also working Saturdays and Sundays.

Since the entry of the November 1, 2002 temporary order of court, the parties have shared physical custody of the child equally, and during their custodial periods each parent has assumed primary care for the child, albeit with assistance from day care providers and family members.

### 4. *Relationship Between Each Parent and Child*

Under the terms of the November 1, 2002 order of court, Father was required to transport the child to and from his periods of custody. As a result, Father has driven nearly every weekend to the Norristown/Phila-

delphia area. As of September 2006, he testified that he had made 192 trips and driven over 107,500 miles. Father claims he has requested Mother to assist in transportation and she has refused. Nonetheless, Father did not file a petition to modify to require Mother to share the transportation.[2] In addition to not sharing the transportation responsibility, Father claims Mother has not come to the child's events.

Mother justifies not participating in the transportation of the child because she does not have a roadworthy vehicle to make these long trips. She is also concerned about her safety. She is fearful of meeting Father alone and would have to arrange for someone to accompany her at the exchanges.

The custody evaluator concluded that the child responded well to both parents. During testimony, both parents became emotional when describing their relationship with the child. Father cried when talking about the child's relationship with her younger brother, S.M.S., and affirmed that he wished to dedicate his life to M.S. and wanted to be a significant presence in her life. Mother became emotive when discussing the activities she and the child share, such as going to the aquarium, zoo, playground, playing Candy Land and reading the *Wind in the Willows.* Mother also told the court that she is not currently dating and that being a mother is her priority.

Mother testified that her pregnancy was unplanned and Father initially denied paternity, but later recanted.

---

2. The court's order of September 20, 2006 did require the parties to share transportation.

Mother stated that Father was distant during the pregnancy and did not go with her to doctor's appointments. Father told the custody evaluator that he was shocked by Mother's pregnancy. He claims that at that time he was dating his now current wife, K.S., and as a result, he broke off the relationship with K.S. Mother describes the birth of the child as traumatic.

According to Mother, the child was born by Caesarian section after 24 hours of labor. Mother received two blood transfusions and was hospitalized for two weeks following the birth. The parties contemplated bringing a malpractice action against the obstetrician. Mother states that Father's secretary drove her and the child home from the hospital. In contrast, Father described the birth experience as a routine Caesarian section. He could not recall if he brought Mother and the child home from the hospital.

## 5. Interaction With Parent, Siblings and Other Persons Who May Affect the Child's Best Interest

Both parents have a supportive and loving network of family and friends. Father has been married to his current wife, K.S., since July 2, 2004. They have known each other for approximately five to six years. K.S. has known M.S. since the child was seven months old. K.S. is currently 29 years old and employed as a high school guidance counselor at Shade High School near Johnstown, Pennsylvania. She works from 8 a.m. until 3 p.m. during the school year, leaving their home at 6:30 a.m. and returning by 4:30 p.m. She believes her relationship with M.S. is positive, noting that they are buddies and that she has been the child's t-ball coach. In addition, Father

has a brother, two sisters, his parents, and aunts and uncles in the Indiana County area. Father and K.S. have a son named S.M.S., who was born April 6, 2006. Defendant's exhibit number 1 was a photograph of M.S. and her brother S.M.S. taken in August of 2006.

Father testified about M.S.'s relationship with her brother:

"M.S. loves S.M.S. to death. Every time she is on the telephone, even with her—with M.B., her Mother, she is always saying I've got to see S.M.S., you want to talk to S.M.S., she just really loves S.M.S. and we were—we went on a family vacation to Virginia Beach and we were all sitting there and on the beach and we were all just— all of us were just there and M.S. sat there and she said— she said all I need is my family, my Mom, my Dad, my baby brother and best of all my baby brother and that's really how she feels and that's how she shows, you know, M.S.'s constantly when we are—we spend a lot of family time at home in the evenings and M.S. will sit in the living room and she will look around, she said I have such a nice big family you know—it's just, it's really a nice thing." (Hearing transcript, 9/19/06, pp. 35-36.)

K.S. also confirmed that M.S. has a positive relationship with her baby brother noting that M.S. gets supplies for him and that they play together.

Mother lives in close proximity to the maternal great-grandmother, J.H., currently age 73. J.H. raised Mother following her own mother's death and the incapacity of her father. J.H. currently cares for the child while Mother is at work and when the child is not attending pre-Kindergarten. Mother has two younger brothers, R.B.

and L.B. R.B. resides with the maternal great-grand-mother. L.B. is a paratrooper with the 82nd Airborne out of Ft. Bragg, North Carolina. Mother also relies heavily upon her best friend, J.S., who lives within five minutes walking distance from Mother's home in Norristown. Mother and J.S. have known each other since they were four years old. J.S. has two children, ages 11 and two. Mother also has numerous family members in the Norristown area.

### 6. *Child's Adjustment to Home, School and Community*

Father lives in Indiana Borough having recently relocated to 250 South Fifth Street across from the Horace Mann Elementary School in April of 2006. He previously had resided at 333 Walnut Street in Indiana. His new home is a four-bedroom residence. It has a small play yard and a play house.

The child is attending a pre-Kindergarten program at St. Bernard's Elementary School. St. Bernard's is a faith based Catholic program. Father and his family members attended this school. When the child is not attending St. Bernard's, she is enrolled in a child care program at Grand Beginnings. The Grand Beginnings program is curriculum based and provides a structured schedule. The child has also engaged in t-ball and gymnastics while in the Indiana area.

Father gets the child up in the mornings. On Mondays, Wednesdays and Fridays, he takes her to Grand Beginnings and picks her up at 12:15 p.m. to take her to the pre-Kindergarten program at St. Bernard's. He also picks her up at the conclusion of this program at 3 p.m. On

Tuesdays and Thursdays, the child spends the entire day at the Grand Beginnings program and K.S. picks the child up at 4 p.m.

Father provides a structured environment for the child at his home. There is no cable TV in his household and the child's movies are monitored to be age appropriate. Father cooks all of the meals and is adamant that the child should not eat fast food. After dinner is family time and the family engages in games and family activities.

Mother resides in Norristown in close proximity to the maternal great-grandmother, her work and the child's school. The maternal great-grandmother lives approximately two and a half blocks from Mother's home. Mother's employment is 10 minutes away. Her best friend J.S. also lives 10 minutes away. The child attends a pre-K program at St. Francis of Assisi. This is a block and a half from Mother's home.

Mother describes her neighborhood as residential. Plaintiff's exhibit H shows photographs of Mother's neighborhood. On rebuttal, K.S. challenged the depiction of the neighborhood portrayed in the photographs. She claims that on the times she has accompanied Father to pick up the child, the streets are not as deserted. She characterized the area as being urban and noted that there are often small children about who are unsupervised and suspicious individuals.

Mother states that her residence is located close to parks and a community library. Mother lives in the bottom floor of a condominium. There is a yard area shared with other residents of the condominium. Mother states that her neighborhood is safe. Mother notes that the child does not have very many friends in this neighborhood,

but does have more friends in the great-grandmother's neighborhood. The photographs provided by Mother do not contain an actual photograph of her residence. Mother states that this picture did not develop. Mother did provide a photograph of a similar residence. Mother's photographs do contain pictures of the interior of her residence.

Mother described the pre-K program at St. Francis of Assisi as focusing on the fundamentals and socialization of the child. There are 16 children in the class with one teacher and one aide. If the child would primarily reside with Mother, then Mother will send the child to St. Francis. St. Francis provides an education through the eighth grade. According to Mother, there are several other schools which would permit the child to complete a parochial school education. Both parents agree that they have a common understanding that the child will attend parochial school.

While Mother does not attend church regularly with the child, the child has gone to Mass with her maternal great-grandmother on Fridays. Mother states that the parties' exchange schedule makes it difficult for her to attend services on Sunday because she is never certain at what time Father will pick up the child. She concedes she could attend services on Saturday evening but does not because she wants to engage in other activities with the child.

### 7. Length of Time Child Has Lived in a Stable, Satisfactory Environment and the Desirability of Maintaining Continuity

Due to the geographical distance which separates the parties, an award of primary physical custody during the

school year must be made. If geography were not a factor, the custody evaluator's report noted that this would be an ideal case for joint physical custody.

### 8. *The Permanence, As a Family Unit of the Existing or Proposed Custodial Home*

Since the parties' separation, Father has lived at two addresses, both in Indiana Borough. Father has maintained stable employment. He has also been married to his wife, K.S., since July of 2004. The custody evaluator noted that the presence of a sibling and the child's good relationship with her stepmother are both positive factors for Father.

Mother has resided at four different addresses since leaving Indiana in August of 2002. She has lived at her current residence in Norristown for nearly two years as of the time of the September 19, 2006 hearing. (Hearing transcript, 9/19/06 p. 86.) Immediately following the parties' separation, Mother resided with her grandmother in Norristown. This was the residence Mother lived in during her childhood. Mother next lived in King of Prussia while she worked at a genetic institute. Mother stated that this was not a "good area and there was police activity." She moved to a town house in Hollow Tree Court in Sanatoga to get focused and save money. (Hearing transcript 9/19/06, pp. 115-16.) Mother's employment with the genetic institute ended when the company went out of business. Following a period of unemployment, Mother obtained a job as a marketing director of CECO Filters in Conshohocken. From her home in Sanatoga, this would have been a longer commute for

Mother, so Mother relocated closer to her grandmother to "simplify everything."

### 9. *Mental and Physical Health of All Individuals Involved*

Both parties raised concerns about the mental health of the other. Mother contends that Father had emotional problems following the birth of the child. Father does admit he took Paxil for anxiety for a brief period in April of 2002. Father also acknowledges that he was "very depressed" and did seek out counseling following the filing of the protection from abuse petition in August of 2002. He remained in counseling for a period of six months. No medications were prescribed.

Father stated that the reason for the parties' separation in July, 2002 was because of Mother's mental problems. He asserts she was not caring for the child appropriately, and not on the medication she needed. However, he did entrust the child to her care for a period of 18 days while he took a trip to Jamaica in August 2002. Plaintiff's exhibit E, which is a letter Mother said Father wrote to her and which Father denies writing, contains the following quotation "I am sorry for anything I said at the custody hearing that made you feel like you were an unfit Mother. I think you are a great Mother."

Father asserts that Mother has a history of mental illness and that she has been diagnosed as bipolar and prescribed medication. Mother denied that she was ever diagnosed as bipolar or had taken the medication Lithium. Mother acknowledges that her childhood was traumatic following her own mother's death when she was 12. Her father lost custody due to his alcoholism and the

child protective service agency from New York State placed the children with the maternal great-grandmother, J.H.

The custody evaluator found that both parents are emotionally healthy and there is no evidence of pathology. He also concluded that there was not an indication on Mother's MMPI II that she suffers from a bipolar diagnosis. However, it was the custody evaluator's clinical sense that Mother tends to be manipulative and the custody evaluator recommended that the court consider this personality trait. The custody evaluator's based his belief that Mother is manipulative on the protection from abuse action that was filed in August 2002 and the child's hospitalization in February, 2006.

10. *Capacity or Disposition of the Parties To Give the Child Love, Affection, Guidance, and To Continue Educating and Raising the Child in the Child's Culture and Religion or Creed, If Any*

Both parties are financially able to provide for the child and have demonstrated their capacity to attend to her care and education needs. Father, age 29, is the owner of a scrap metal recycling business. He is responsible for overseeing the business' day to day operations and procuring clients. He works from 8 a.m. until 5 p.m. Monday through Friday and from 8 a.m. until noon on Saturday. As the business owner, he does have some flexibility in his work schedule. Currently, Father pays $342 per month in child support to Mother. While Father acknowledges that his income has increased, Mother has not pursued an increase in the child support obligation. Mother testi-

fied that she is not interested in higher support payments.[3]

Father's wife, K.S., describes Father as a "super Dad," who is patient and teaches his daughter, as well as spending lots of time with her. She notes that Father and the child enjoy rhyming jokes and that Father is responsible for feeding the child, taking her to school, bathing her and dressing her.

Father is concerned that Mother permitted the child to see the movie "Cat Woman," which is rated PG-13. Mother denies that the child saw "Cat Woman." She believes the child heard about the movie from her friend's child and talked about it. Mother questions Father permitting the child to see a Harry Potter movie, rated PG.

Mother is currently 30 years old and is a marketing coordinator for an environmental company, a job she has held for a year and a half. She works from 8 a.m. until 5 p.m. Monday through Friday. She has one hour for lunch. She attempts to come home and have lunch with the child at the maternal great-grandmother's residence. While Mother is at work, the child is cared for by the maternal great-grandmother, J.H. According to J.H., the child typically arrives between 8 and 8:30 and leaves her residence around five. Since the child's enrollment at St. Francis of Assisi, Mother takes her to school in the morning and the maternal grandmother picks her up at 2:30 p.m. The child has two close friends in the neighborhood. While the child is with J.H., she and the child read,

3. At one time, Father had been paying $825 per month for support, but this was reduced.

color, and go on walks. The child also rides her bike and plays in her motor car. During the child's weeks with Mother, Mother plans activities for the child, which include visiting an aquarium, the zoo, playground, as well as playing games and reading books.

## 11. *Domestic Violence*

Mother alleges serious physical abuse by Father at the time of the parties' separation. Father adamantly denies that the abuse occurred. The court received considerable testimony on this matter.

Following the child's birth Mother states that the parties' relationship deteriorated and Father became distant. The parties had constant fights, however, Mother concedes they were not physical.

Mother testified that on the weekend of July 27, 2002[4] the parties argued about the cleanliness of the home. According to Mother, Father requested Mother leave so he could bring someone in to clean the house. Mother took the child to her brother's residence, also in Indiana. The following Monday, July 29, Mother claims that one of Father's employees, Bud Lawson, came and informed her that Father wanted to talk with her. Mother went to the parties' residence on Walnut Street and Mother claims that Father removed the child from her custody, physically assaulted her and ejected her from the residence.

---

4. Initially Mother claimed that the date was Sunday, June 27, 2002. She then amended this to say the date was July 27, 2002. (Hearing transcript, 9/19/06, p. 98.) It is notable that June 27, 2002 was a Thursday and July 27, 2002 was a Friday.

In her PFA petition, Mother described the incident as follows:

"At the end of June,[5] on Monday, S.S. invited me into his house (we had been separated for a week) he took the baby from me and put her in the bedroom. I began to cry. He grabbed the back of my leg and squeezed leaving a large bruise. I then got up to remove the child from the house with me. As I approached her, he grabbed me by the back of my head and drug me across the bedroom floor. I braced myself against the door jam. He grabbed my arms and twisted them as I tried to escape his hold until he got me to the door and pushed me through all the while screaming at me and threatening to kill me if I went to the police or tried to see her." (Paragraph 15 of plaintiff's exhibit C. The text of this paragraph was without punctuation and the court has added punctuation to this passage. Spelling errors were also corrected.)

Mother states that after the incident occurred, she ran from the Walnut Street residence to the Fourth Street Sheetz. She called Father's business to speak with her brother, R.B., who was employed at the business. She described feeling dizzy.

Mother did report the incident to the police on August 1, 2002, but testified that the police were not helpful and an investigation did not occur. She also consulted with the local legal services agency regarding a protection from abuse petition. She stated that on the same day she did these things, August 1, 2002, Father threatened to

5. During cross-examination by Father's counsel on December 6, 2006, Mother conceded that the date in the petition was incorrect. She explained that she did not review the form when she signed the affidavit in August 2002.

take the child with him to Jamaica and that she would never see the child again.

Father did give Mother custody of the child on August 2, the day before he left for a planned trip to Jamaica. The maternal great-grandmother and Mother's brother were present during this exchange. After obtaining custody of the child, Mother took the child to Norristown to reside with the maternal great-grandmother.

On August 15, 2002, a petition for protection from abuse was filed in Montgomery County. Mother explained the delay in filing by noting that appointments for abuse intakes only occur on Tuesdays. In all, she characterized the procedure of obtaining a PFA in Montgomery County as a "drawn out process." Mother also claims that while Father was in Jamaica, he contacted her after receiving the PFA and threatened her.

Mother introduced into evidence plaintiff's exhibit B 1-5, which are photographs of her injuries taken at the Alice Paul House, a local domestic violence center in Indiana County, on August 2, 2002. Photograph no. 1 (number 4999) depicts a bruise on her left inside forearm above her wrist. Photograph no. 2 (number 5000) shows two bruises on the back of her left arm (from her elbow to her shoulder), including a circular bruise the size of a quarter or larger. Photograph no. 3 (number 5001) shows a horizontal bruise that runs across the back of her left upper leg. Photograph no. 4 (number 5003) depicts the bruises on the back of her arm as seen in photograph no. 2. Photograph no. 5 (number 5004) is a full body photo of Mother with her identification card and the date the photographs were taken.

The maternal great-grandmother testified that she observed the bruises on Mother's arms, chest, and backs of the legs and also noticed that part of Mother's hair had been pulled out on her head. Mother's brother, R.B., initially testified he saw Mother on the morning of the abuse incident, July 29, before she left to meet with Father, and she did not have bruises. He later equivocated and stated that he may not have seen her that morning. However, he did believe that he saw her on July 28, and she may have spent the night with Father on July 28. R.B. described receiving the phone call from Mother while he was working at Father's business on July 29. He described Mother as being hysterical. When he found her at the Fourth Street Sheetz, her arms were red and her face was flushed. He took her to his apartment and tried to convince her to go to the police. Following this incident, R.B. never returned to work at Father's business.

The maternal great-grandmother testified that she was aware that Father called Mother at her residence from Jamaica during August. She states that Mother told her that Father was coming to get the child. This caused Mother to be very upset and afraid and because of Mother's fear, she left the maternal great-grandmother's residence to live with another family. The maternal great-grandmother testified that she was also apprehensive that Father would come to her residence.

Mother claims to have received numerous letters from Father after the parties' separation. Mother introduced plaintiff's exhibit E which she states is one of these letters. The letter is a handwritten, undated, three-page document. Mother believes it may have been received

after the parties met for their initial custody conference in Indiana County. (Hearing transcript, 9/19/06, p. 114.) Mother states that it is Father's handwriting and that she is familiar with his handwriting. While Father denied that the letter was from him, because he claims to have typed all of his correspondence, he concedes that he could have made some of the statements in the letter. (Hearing transcript, 9/19/06, p. 68.) Included among these statements is "Please forgive me for my mistakes."

Father adamantly denies the abuse incident and claimed that the incident described in the protection from abuse petition "never, never happened." (Hearing transcript, 9/19/06, p. 14.) Father also denied threatening to kill Mother or break into her Montgomery County apartment.

Father did not defend against the protection from abuse action. He claims he was counseled by his business attorney to not attend the October 1, 2002 final protection from abuse hearing. He notes that "I was very weak at the time and really was not at the level to defend against everything." (Hearing transcript, 9/19/06, p. 17.) Father also claims that during this time he had business problems.

A hearing did occur in Montgomery County on October 1, 2002. As a result of the proceeding, a final protection from abuse order was entered naming Mother and child as protected parties. Mother was awarded primary physical custody of the child pending further proceedings in Indiana County. Mother had commenced a complaint for custody in Indiana County on August 30, 2002. The

duration of the protection from abuse order was 18 months or until April 1, 2004.

### 12. The Disposition of Each Parent to Encourage Frequent and Continuing Contact by the Other Parent With the Child

The parties raised numerous concerns about the other parent in regard to this factor. The concerns centered on the exchanges, withholding contact, the child's baptism, communication, pets in Mother's household, and the stepmother assuming the role of the mother. The court will consider these incidents as each relates to which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the non-custodial parent and the child.

This case first came to the court's attention by the special relief action filed by Father on February 13, 2006. Father's petition states that he had traveled to the Norristown area on February 5, 2006 to pick the child up for his weekly period of custody to begin on the following day, February 6, 2006. In the middle of the night, Father received a call from Mother that the child was at the Emergency Department of the Children's Hospital of Philadelphia as a result of a health issue. According to Father's petition, he was informed by Mother that in accordance with a medical directive the child would not be able to travel and thus, could not make the return trip to Indiana County with him. In fact, plaintiff and defendant's joint exhibit A includes the Emergency Department Summary, which shows a diagnosis of synovitis[6] and

---

6. Medline provides the following information about toxic synovitis:

contains the restrictions: "No travel for next seven days. Activity as tolerated."

At the hearing, Father testified that he spoke with the child's treating physician on February 6 and was informed that Mother had requested the travel restriction. The physician subsequently issued a new instruction sheet that did not contain travel restrictions. Father noted that when he went to pick the child up, she only had a minimal limp. While the child had been prescribed Ibuprofen, Father did not administer it because the child did not appear to be in pain. Father claims Mother told him the child was also prescribed antibiotics but Father confirmed this was not the case. Upon return to Indiana County, Father had the child examined by her treating physician, Dr. Jabir, who pronounced the child healthy and having no symptoms of toxic synovitis. Father claims

---

"Toxic synovitis is a frequent cause of limping with hip pain in children. It occurs in children prior to the onset of puberty and is a transient arthritis of the hip that usually resolves on its own. Its cause in not known but boys are affected more frequently than girls (approximately 4 to 1).

"Symptoms are usually mild and generally include hip pain and a slight limp. The hip pain almost always involves only one side (unilateral). A low grade fever (usually less than 101 degrees) may be an early symptom. Aside from the hip discomfort, the child does not usually appear ill.

"Toxic synovitis is a diagnosis of exclusion, which means that it is diagnosed when other, more serious conditions, have been ruled out. In children there are three potentially serious diseases that can cause hip pain and limp: septic hip, slipped capital femoral epiphysis, and Legg-Calve-Perthes disease. Once these other diagnoses have been excluded, then the diagnosis of toxic synovitis (which is the most common of all these diseases) is usually made." *Medline Plus Medical Encyclopedia,* http://www.nlm.nih.gov/medlineplus/ency/article/000981.htm (last visited January 22, 2007).

that when he informed Mother of this, she became irate and seemed upset that the child had gotten better. Father believes this occurrence is an example of how Mother has manipulatively attempted to withhold contact with him.

Father acknowledges that the child remained in his custody for three weeks because during the week that would have been Mother's week with the child, the weather was inclement and travel was not safe. However, this contradicts the information set forth in the father's petition for special relief filed on February 13, 2006, which stated, "Father decided on February 12, 2006, that he would not return the child to Mother until he could better determine the nature of Mother's motivation in this situation, . . ." (Paragraph 7, petition for special relief.)

Father acknowledges that he did not permit M.S. to speak to Mother after the parties had the contentious phone call regarding the child's health improvement. Father told the court he did not permit Mother to speak with the child "because of her tone and attitude with respect to the call." (Hearing transcript, 9/19/06, p. 15.) Father further claimed that Mother never called during the balance of the three-week period that he retained custody.

Mother and the maternal great-grandmother provided detailed testimony about the child's symptoms prior to the hospital treatment. On the morning of February 2, 2006, prior to the child being dropped off at the maternal great-grandmother's residence, Mother claims the child complained of leg pain. Mother did go to work, but received a phone call at 9 a.m. from J.H. J.H. told Mother

that the child was in more pain and could not stand up. Mother took the child to Montgomery Hospital and left a message for Father. According to Mother, a physician told her that the child appeared to have a septic joint disorder and that it could be necessary to do a spinal tap. The child was then transported via ambulance to Children's Hospital of Philadelphia for examination. The child's condition improved on February 3. However, on February 4, the child again complained of pain and Mother took the child back to Children's Hospital of Philadelphia along with her friend, J.S. Mother asked the treating physician if the child could travel and, according to Mother, the doctor was adamant that travel should be restricted. When Father presented her with the updated medical instructions, Mother permitted the child to return to Indiana County with Father. Mother agreed she was upset that Father had not administered the prescribed medication because he was not following medical instructions for what Mother characterized as a "life threatening fever."

Both Mother and the maternal great-grandmother state that Mother attempted to call the child during the three-week period that Father had custody in February. According to the maternal great-grandmother, she observed Mother calling and noted that the calls were not answered at Father's household.

Both parents report that the child was affected by this episode. According to Father, the child was reluctant to go to day care and was more clingy and scared. Mother also reported that the child was clingy and scared and described incidents during which the child had become hysterical.

Father cites Mother acquiring pets, a cat and a dog, as another example of her manipulation of the child. Father states that the child has become upset because she believes there will be no one to feed the cat at her Mother's residence if she lives with her Father full-time. Father notes that both of Mother's pets were obtained after he filed his petition to modify and Father believes it is not in the child's best interest for Mother to have pets that the child would miss if the child were in his primary custody.

Mother acknowledges obtaining a cat in December of 2005. She also stated that she had been searching for a dog for some time and after acquiring the cat, a free pug dog became available. Mother specifically denies obtaining the dog to compete with the child's brother, S.M.S. Mother also noted that it is she, not the child, who feeds the cat.

Father also asserts that Mother kept the child from him during the pendency of the protection from abuse action for a period of two months. However, Mother did commence a custody action soon after filing the protection from abuse petition, and following the initial custody conference on October 29, 2002, Mother agreed to a temporary shared physical custody arrangement that eventually became the parties' custody plan.

A matter of great concern to Mother was that Father arranged to have the child baptized at his church, St. Bernard's, on September 25, 2004. Mother was not informed in advance that the child was to be baptized, nor was she or her family members invited to the ceremony. According to Mother, the original baptismal certificate

listed Father's wife as the mother. Father claims that this was a clerical error made by the church.

Father explains that he went ahead with the baptism due to his Catholic faith and belief that it was important that the child receive the sacrament, especially because of the child's weekly trips across the state. Father claims that Mother is not religious. He acknowledges not discussing it with Mother in advance due to the poor communication between the parties. Notably, the November 1, 2002 order does not award legal custody or require the parties to consult on these matters. Father now admits he should have handled the baptism differently and consulted with Mother in advance.

Mother claims that she wanted to make arrangements to baptize the child and that she proposed to Father that each parent select a Godparent. She claims that Father refused to cooperate in this discussion. Father, in his testimony, denied that any conversations had occurred between them regarding baptism.

The custody evaluator, in his written report, at p. 16, notes that if Father did not invite Mother to the baptism and has taken other actions to undermine Mother's relationship with the child, then these actions should be considered by the court.

Mother is also concerned that the child refers to her stepmother, K.S., as "Mom" and "my other Mom." Mother has raised this concern with Father. Father testified that he has not discouraged the child from calling his wife Mom. Father states that he would not object to the child calling Mother's paramour or husband "Dad." Father also noted that initially the child had a made-up

name for her stepmother, K.S., which is "Coggy." He related a conversation that the child had with K.S. during which she told K.S. that she would be sad if she couldn't call her Mom anymore.

Mother also presented the child's Kindergarten registration form for 2006-2007, which listed K.S. as the mother. K.S. claimed she completed this form and that the school was aware of who the child's mother is.

Mother also complains that Father has not informed her of significant activities and events in the child's life. K.S. admitted not giving Mother the child's t-ball schedule.

At the hearing in September 2006, an issue was raised regarding Father videotaping the exchanges of the child. Apparently, the videotaping began following the special relief proceeding that occurred in March 2006 due to allegations (which were not presented to the court in detail) that Father and/or his wife were disruptive at the exchanges. Father maintains that he is videotaping the exchanges to document accurately what has occurred and that the child has not been affected by the videotaping.

Mother's friend, J.S., who observed exchanges before and after videotaping occurred, noted that Father's behavior improved during videotaping. J.S. stated that during the non-videotaped exchanges, Father could be unfriendly and intimidating. However, since the videotaping has occurred, he has been more congenial.

The court's order of September 20, 2006 prohibited "videotaping, audio recording, or photographs taken during the exchange of the child." In spite of this, at the

December 6, 2002 hearing, Father acknowledged that he brought a video camera to an exchange after the September 20, 2006 court order. While Father did not videotape the exchange, he admitted he was prepared to use the video camera to protect himself. He again claimed that the taping had no effect on the child.

### 13. *Court Appointed Evaluator*

The court received expert testimony from the custody evaluator. The custody evaluator testified that there was no clear conclusion from the psychological data and consequently, he could not make a recommendation. However, he did present observations for the court's consideration. He characterized these observations as "concerns," which were suspicions, but not hard conclusions.

In regard to the mother, the custody evaluator is concerned that she is manipulative. The custody evaluator compared Mother's protection from abuse petition to sexual abuse claims occurring after a relationship separation. He noted that 50 percent of these sexual abuse claims are false.[7] He characterized the protection from

---

7. The *Domestic Violence Benchbook for Judges* quotes the American Psychological Association on this point as follows: "Although many people believe that women especially will lodge false charges of child abuse or battering against their spouses in an effort to manipulate or retaliate, the rate of false reports in these circumstances is no greater than for other crimes." Am. Psychological Ass'n, Violence and the Family: Report of the American Psychological Presidential Task Force on Violence and the Family 12 (1996), Pennsylvania Coalition Against Domestic Violence, A Domestic Violence Benchbook for Judges, IV-10, June 2005. While some researchers have concluded that the rate of false allegations ranges from 35-50 percent, the majority of

abuse action as not being timely (presumably based upon the erroneous date in the petition that one of the incidents occurred in June 2002). The custody evaluator acknowledged that he was aware that there were photographs of Mother's injuries, but he did not view these. When presented with the photographs by the court for review, he did not reach a conclusion. He did state that the photographs showed injuries and stated further that if the court concluded that Father had abused Mother, then Mother should have custody, "no questions asked." The custody evaluator was skeptical of Mother's account that the police failed to investigate the abuse because of an alleged relationship between the officer and Father. The custody evaluator also faulted Mother for relocating from Indiana County in August of 2002 and stated that she could have done more to stay in the Indiana County area.

According to the custody evaluator another example of Mother's manipulation relates to the travel restrictions following the child's hospital treatment. However, during his testimony, the custody evaluator conceded that Father, when confronting the doctor on February 6, 2006, could have been overbearing and manipulated the countermaundering of the prior recommendation. The custody evaluator believes that the baptism incident was misconduct on Father's part. The custody evaluator thinks a strong factor in favor of Father is the child's sibling, S.M.S. The custody evaluator noted that it was not the

---

studies have produced findings similar to the American Psychological Association. Andrew I. Schepard, *Children, Court and Custody*, 97-98, Cambridge, 2004. The court notes that statistics such as these are irrelevant to the court's responsibility in individual cases.

nuclear family present in Father's household, but the sibling relationship, that tips the balance towards Father. He characterized this as a strong advantage for Father.

## ANAYLSIS

The court finds many of the factors discussed to be neutral in evaluating the child's best interests. While Mother was the primary caregiver for the child's first seven months, the November 1, 2002 "temporary order" led to an equally shared physical custody arrangement. Each parent has a strong bond with the child. Both parents have been attentive, responsible, and loving caregivers who have created rich and structured homes for the child. There are no serious concerns about the parents' mental or physical health. Both parents are capable of exercising primary custody.

Father's case for primary custody is supported by several factors, the most significant being the presence of a sibling in his household. The court also notes positively the commitment shown by Father in providing all the transportation to and from his periods of custody for a period of nearly four years. Father's wife has a close relationship with the child, and the court was favorably impressed by her. Father's stable long-term relationship with his wife is also an additional consideration for him.

However, these strengths are countered by other factors which cause concern. Mother has alleged domestic violence, which Father adamantly denies. There is also evidence that Father would be less likely to permit and encourage contact with Mother.

It is well settled that absent compelling reasons to the contrary, the policy in Pennsylvania is to permit siblings, including half-siblings, to be raised together. *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980). *Saintz v. Rinker,* 902 A.2d 509 (Pa. Super. 2006). It has been suggested that compelling reasons are synonymous with the clear necessity requirement of the Juvenile Act. *Pilon v. Pilon,* 342 Pa. Super. 52, 56, 492 A.2d 59, 60 (1985). Under this definition, a compelling reason is one that is necessary. *In re Custody of Hernandez,* 249 Pa. Super. 274, 376 A.2d 648 (1977). A good reason is not necessarily a compelling reason. *Pilon* at 56, 492 A.2d at 60. However, the policy of keeping siblings together is *only* a consideration and not a controlling factor in the ultimate custody decision. *Saintz; Johns v. Cioci,* 865 A.2d 931 (Pa. Super. 2004). Admittedly, the policy against separation of siblings is nuanced and can best be summarized as thus: While family unity is only one consideration, and not a controlling factor, a court must still find compelling, not just good, reasons to separate siblings.

An additional consideration is whether the siblings have been reared together prior to the separation or divorce of the parents. In *Johns* Judge Beck observed that in the majority of cases that have invoked the whole family doctrine this has been a determinative factor. *Johns v. Cioci,* at 943. In this case the child never lived in the same household with her younger sister, who was born to the father and stepmother following the parents' divorce. As so aptly noted in *Johns:*

"We do not believe that the divorced parent who has another child by a subsequent relationship should there-

by be favored in a custody decision regarding any older children based on the whole family doctrine. Such an application of the doctrine would imply an unacceptable policy: that the parent who subsequently has additional children with a different partner is automatically favored in a custody dispute. This would be blatantly unfair to the parent who, by choice or fate, has no additional children. We therefore refuse to extend the laudable whole family doctrine to the present facts." *Johns,* at 943.

Our courts have declined to separate siblings where the siblings had been raised together. *Ferdinand v. Ferdinand,* 763 A.2d 820 (Pa. Super. 2000) (awarding custody to mother because half-siblings had been reared together in the mother's household); *Hockenberry v. Thompson,* 428 Pa. Super. 403, 631 A.2d 204 (1993) (custody to mother who raised half-siblings, 14 months apart in age, together for three years prior to father taking custody of his daughter); *Wiskoski v. Wiskoski,* 427 Pa. Super. 531, 629 A.2d 996 (1993) (two older half brothers were raised with younger brother as a whole family for four years. Remanded to trial court to consider the doctrine of "family unity"). Where siblings have lived apart, the whole family doctrine is weaker. *E.A.L. v. L.J.W.,* 443 Pa. Super. 573, 662 A.2d 1109 (1995) (Siblings and three younger half-siblings were never reared together. Trial court relied too heavily on policy which favors raising siblings together.); *Cardamone v. Elshoff,* 442 Pa. Super. 263, 659 A.2d 575 (1995) (child lived with maternal aunt for three years while half-brother lived with mother and stepfather). *M.D. v. B.D.,* 336 Pa. Super. 298, 485 A.2d 813 (1984) (mother became pregnant with half-sibling

during litigation. Child only lived with his half-sister for a month and a half after her birth.).

In the present case, Father filed his petition to modify custody on December 19, 2005, more than three months before the child's sibling, S.M.S., was born. On the date of the initial hearing, September 19, 2006, S.M.S. was five months old, and given the parties' shared physical custody arrangement, M.S. had spent approximately two and a half months in the same household with her half-brother. The court does recognize and find credible the description of the child's close relationship with her brother. However, as in the *Johns* case, these siblings did not reside together in a family unit prior to the current litigation being commenced, and consequently the whole family doctrine is less persuasive. Moreover, the court believes there are compelling reasons that necessitate the separation of the siblings.

Pennsylvania child custody law requires the court to consider a parent's abusive conduct. 23 Pa.C.S. §5303(a)(3). Abusive conduct is defined by the Protection from Abuse Act.[8] There are few reported cases that have con-

---

8. 23 Pa.C.S. §6102. Under this section "abuse" is defined as follows:

"The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

"(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

"(2) Placing another in reasonable fear of imminent serious bodily injury.

sidered this provision. In *Landis v. Landis,* 869 A.2d 1003 (Pa. Super. 2005), a protection from abuse order was entered against the father by consent with no finding of abuse. The father was subsequently found guilty of indirect criminal contempt of the PFA order. However, the custody arrangements were not altered after the indirect criminal contempt. The Superior Court held that the trial court misapplied the law when it failed to consider the PFA and other factors as having primacy over the existing shared custody arrangement. Similarly, the Superior Court acknowledged in *Burkholder v. Burkholder,* 790 A.2d 1053 (Pa. Super. 2000) that the trial court properly considered the three PFAs that the mother had sought against the father in making the custody decision. It is clear that a trial court's failure to create a record and give consideration to abusive conduct will result in a remand. *Costello v. Costello,* 446 Pa. Super. 371, 666 A.2d 1096 (1995).

In this case, while there were inconsistencies regarding the date of the abuse incident, the court believes that it is more probable than not that Father was abusive to Mother. The photographs submitted by Mother were taken at the local domestic violence center four days

---

"(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. §2903 (relating to false imprisonment).

"(4) Physically or sexually abusing minor children, including such terms as defined in chapter 63 (relating to child protective services).

"(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under title 18 (relating to crimes and offenses)."

after the altercation and depict bruises on Mother's arms and leg. Mother's brother and the maternal great-grandmother observed Mother's injuries. The court did not consider these witnesses to be biased. On the contrary, the court found their testimony, especially the testimony of the maternal great-grandmother, to be reliable and credible.

The legislative purpose of section 5303(a)(3) is to protect children from the physical, sexual and emotional consequences of a parent's abusive conduct.[9] Research has established a significant connection between domestic violence and child abuse in families.[10] Batterers also tend to be uninvolved and neglectful parents.[11] While family violence is always unacceptable, it occurs in degrees and must be considered on an individual basis. The court must balance the child's protection with the child's need to have a continuing relationship with the abusive parent.[12]

---

9. Honorable Emanuel A. Bertin and Arthur S. Zanan, *Pennsylvania Child Custody*, 53, George T. Bisel, 2007. The domestic violence amendment to section 5303 followed a unanimous resolution of the United States Congress in 1990 urging states to revise their child custody statutes to create a presumption that batterers should not be awarded custody. Pennsylvania responded by enacting section 5303(a) (3) that required courts to consider abuse in making child custody determinations.

10. Andrew I. Schepard, *Children, Court and Custody*, 85 n.273, Cambridge, 2004.

11. Batterers are more authoritarian, less physically affectionate, unaware of details about their children's lives, and more likely to have age inappropriate behavioral expectations for their children. Pennsylvania Coalition Against Domestic Violence, *A Domestic Violence Benchbook for Judges,* IV-12, n.35, June 2005.

12. Andrew I. Schepard, *Children, Court and Custody,* 86, Cambridge, 2004.

Here, the domestic violence occurred once. Mother confirmed that Father was not physically abusive prior to the July 29, 2002 incident. (Hearing transcript, 9/19/06, p. 151.) In addition, Mother agreed to Father's shared custody of the child, then an infant, on a weekly basis, two months after Father's abusive conduct. Since that time, Father has proven himself to be a loving and dedicated parent, exhibiting none of the qualities that are typical of battering parents. While the court does consider Father's abuse of Mother on July 29, 2002 significant, it is not the most important factor in the court's award of primary physical custody to Mother.

The most relevant factor, and the consideration that resolves this difficult case for the court, is the determination of which parent is more likely to encourage, permit and allow frequent and continuing contact between the child and the other parent. Like family violence, this is a mandatory factor for a court's consideration. 23 Pa.C.S. §5303(a)(2). There are several occurrences that raise uncertainty about the likelihood that Father will encourage frequent and continuing contact between Mother and the child. Foremost of these is Father's unilateral decision to baptize the child. Father now admits this was a mistake. However, the court sees this as part of a pattern to weaken the mother-child bond. Father has not taken action to address Mother's concern that the child refers to her stepmother as her "other Mom." The child's Kindergarten registration form listed the stepmother as "Mother." Significantly, this occurred *after* the clerical error in the child's baptismal certificate also listing the stepmother as mother. The stepmother confirmed that Mother was not provided with the child's t-ball schedule. The most disturbing incident was Father's denial of

telephone access to the child during the three-week period in February when he had physical custody of the child. The court simply does not find credible Father's assertion that Mother did not call the child during this period. In addition, Mother's claim that she attempted to make phone calls while the child was in her father's custody was confirmed by the maternal great-grandmother. Father's interference with Mother's relationship with the child is harmful to the child's best interests.

In contrast, Mother's behavior has demonstrated encouragement and respect for Father and his relationship with the child. Mother testified that she attempted to discuss the child's baptism with Father, but was rebuffed by Father. Mother honored Father's preference to enroll the child in Catholic school. Mother was willing to share physical custody of the child, even though she had been awarded primary physical custody through the protection from abuse action, when the child was seven months old. Mother also didn't pursue an increase in child support, even though Father's income increased. The most illustrative example of Mother's willingness to encourage a relationship between the child and Father is contained in her testimony about the child's reaction to the aftermath of the special relief proceeding:

"She was extremely, extremely clingy. It was like we went back to two years old. It was hard for me to go to work. I started coming home every single day no matter what was going on. I was home every day for lunch and always back. She asked me all these questions and I tried to answer them the best I could, you know, and then she started to cry. The night before she went to her dad's I told her days before she'd go to her dad's and she resisted and the night before she was hysterical. It wasn't

normal hysterical, she didn't cry. It's hard because at four there's things they do and they are doing them to play parents against each other, you know, I did it, you know. They do that but this was not that. A half an hour is not that, you know, a half an hour straight and then when her father came to pick her up she had tears in her eyes, *but I didn't you know, I didn't feed into it because I didn't want her unhappy. I told her like, you know, you're going to see your baby brother, going to see Coggy, great, yeah, you know, trying to psyche her up for it so she'd be happy. Oh, that was a vacation and we're coming back in a week try to reassure her. I want her happy. I don't need her to be upset and I don't want her sad.*" (Hearing transcript, 9/19/06, p. 136.) (emphasis added)

The court is also concerned with Father's violation of the spirit, if not the letter, of this court's order of September 20, 2006, which prohibited videotaping of the exchanges. Father admits to bringing a video camera to an exchange, and while it was not used, he testified that he was prepared to use it to protect himself in contravention of the court order. Father justified his actions by his belief that the videotaping does not affect the child. Father's conduct calls into question his willingness to comply with court orders, including directives that require him to promote a relationship with Mother.

The custody evaluator provided the court with valuable insights about the parties. In spite of each parties' concerns about the other's mental health, the court relied on the custody evaluator's conclusion that the parties were emotionally healthy and that there was no evidence of pathology. Further, the custody evaluator found that that the child was bonded well to both parents. However, the custody evaluator could not provide the court with a

recommendation. He did present observations, which he characterized as suspicions, but not hard conclusions. Among these observations were that Mother was manipulative because of the domestic violence allegations that followed the parties' separation and the initial travel restrictions ordered after the child's hospital treatment in February 2006. Since the court does find Mother's domestic violence allegations credible, the court does not believe that this is evidence of Mother's manipulation. Regarding the travel restrictions, the court believes the evidence shows that both parents may have influenced this recommendation, a point acknowledged by the custody evaluator during his testimony.[13] The custody evaluator believed that the strongest factor favoring Father was the presence of a sibling in his household. However, based on the court's analysis of the whole family doctrine, this is not as compelling a factor, and outweighed by the court's finding of domestic violence and the conclusion that Father is less likely to promote a relationship with Mother than she would with him.

A court is not obligated to accept the recommendations of experts, so long as there is competent evidence to support the court's conclusions in the record. *Masser v. Miller,* 913 A.2d 912 (Pa. Super. 2006); *Nomland v. Nomland,* 813 A.2d 850 (Pa. Super. 2002). In *Masser,* the court found that the trial court properly went against an expert opinion where it analyzed the expert's recommendation in light of the facts and found that the expert had not accounted for certain factors. Here this court has

13. After reviewing the testimony and the medical records, the court does find that Mother responded appropriately to the child's health complaints in seeking medical treatment for the child.

analyzed the custody evaluator's observations and concluded that based on testimony and evidence presented, the court cannot accept the custody evaluator's statement that several factors favor Father. (Court's exhibit no. 1, p. 15.)

The court is mindful that unlike in many custody cases, the court's decision will disrupt the stability that the child has known for the past four years. This outcome is inevitable given the parties' geographic separation. Both parties gave remarkably similar and compelling testimony about the traumatic effect on the child of the turmoil following the special relief proceeding. In order for M.S. to thrive in the newly established custody plan, both parents must place M.S.'s interests above their own and strive to ensure that M.S. has as much contact and access with the other parent as possible. In this way, M.S. will find the acceptance and resolution she needs to continue growing.